**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
EASTERN DIVISION**

| | | |
|---|---|---|
| **John Doe**, | * | |
| Plaintiff, | * | Civil Action No. 1:16-cv-2236 |
| | * | |
| v. | * | |
| | * | |
| **Indiana University, Jason Casares,** | * | |
| **Amber Monroe, Leila Faranesh,** | * | |
| **Jocelyn Maul, Harold Goldsmith,** | * | |
| **and Jane Doe;** | * | |
| | * | **JURY DEMAND** |
| **Defendants**. | * | |
| | * | |

## COMPLAINT

Plaintiff John Doe,[1] by and through his attorneys, complains as follows against Defendants: (a) The Indiana University ("IU"), (b) Jane Doe, (c) Jason Casares, IU's Associate Dean of Students and Deputy Title IX Director ("Casares"), (d) Amber Monroe, IU's Associate Director, Title IX Deputy Investigator ("Monroe"), (e) Leila Faranesh, IU's Assistant Director, Office of Student Ethics ("Faranesh"); (f) Jocelyn Maul, Residence Manager at IU ("Maul"); and (g) Harold Goldsmith. IU'S Dean of Students ("Goldsmith"). (IU, Casares, Monroe, Faranesh, Maul and Goldsmith hereinafter collectively referred to as "State Defendants." Together, Casares, Monroe, Faranesh, Maul and Goldsmith are referred to as "Individual Defendants.").

## NATURE OF THE ACTION

1. Having been irreparably harmed by false allegations of sexual misconduct, John Doe seeks damages and injunctive relief to remedy emotional, mental, economic, and physical harm

---

[1] *See generally, John Doe's Motion to Allow the Parties to Use Pseudonyms* (containing the basis for John Doe's request for using pseudonyms in this proceeding).

caused by Defendants. Plaintiff's causes of action include: defamation, intentional infliction of emotional distress, violations of Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.*, violations of the Fifth and Fourteenth Amendments to the Indiana & United States Constitutions, 42 U.S.C. §1983; and breach of contract.

2. For example, IU violated Title IX by creating a gender biased, hostile environment against males, like John Doe, based in part on IU's pattern and practice of disciplining male students who accept physical contact initiated by female students.

3. In addition, Individual Defendants violated the Fifth and Fourteenth Amendments to the Indiana & United States Constitutions, which provide that no person shall be deprived of life, liberty, or property without due process of law.  Similarly, the Indiana constitution guarantees every person injured in his person, property or reputation have remedy by "due course of law."  The Due Process clauses of the Indiana and United States Constitutions are implicated by higher education disciplinary decisions.

4. State Defendants also violated IU policies by improperly and unlawfully applying and/or breaching these policies and/or the implied covenant of good faith and fair dealing inherent in these policies.

5. John Doe's harm stems from unlawful discipline State Defendants imposed on John Doe after Jane Doe filed a complaint on or about November 4, 2015 that falsely alleged John Doe sexually assaulted Jane Doe on October 18, 2015.

6. John Doe did not sexually assault Jane Doe.  Rather, on October 18, 2015, Jane Doe initiated all relevant physical contact with John Doe. The following actions or admissions by Jane Doe demonstrate that she initiated and consented to all contact with John Doe on October 18, 2015:

(a) Jane Doe admits that she invited herself into John Doe's room, accompanied by a friend she was visiting at IU *Exhibit 1* (containing IU's Response to John Doe's FERPA Request), pp.30, 48, 95;

(b) Jane Doe admits that she, her friend, and John Doe had a normal conversation during this time, during which time Jane Doe chose to sit in close proximity to John Doe on his bed *Id.,* pp.30, 41, 95;

(c) Jane Doe admits that after her friend expressed her intent to leave (in her friend's words, so that the two could be alone "to talk and maybe make out"), Jane Doe wanted to stay longer with John Doe, which she did of her own desire and accord *Id.;*

(d) Jane Doe admits that shortly after her friend left the room, she and John Doe began kissing, which led to mutual undressing and fondling and which Jane Doe enjoyed *Id.*;

(e) Jane Doe admits that she asked John Doe if he had a condom, and then the pair discussed using a condom to have sexual intercourse *Id.*;

(f) Jane Doe admits that she asked John Doe to turn out the lights in the room prior to engaging in sexual intercourse *Id.,* pg.30;

(g) Jane Doe admits that she and John Doe engaged in sexual intercourse for a short period of time until her friend knocked on the door *Id.,* pp.30, 41, 95;

(h) Jane Doe admits that John Doe stopped engaging in sexual intercourse when her friend knocked on the door, and when Jane Doe asked him to get the door *Id.,* pp.30, 41, 95;

(i) Jane Doe told IU Police Department ("IUPD") that: (1) her asking John Doe to get the door, was "her way of letting him know that *she did not want to continue* having intercourse"; and that (2) John Doe immediately complied with her request *Id.,* pp.30, 42;

(j) Prior to her friend's interruption of the sexual intercourse, Jane Doe admits that she never attempted to leave the room or told John Doe that she had any reservations about having sexual intercourse *Id.,* pp.30, 42;

(k) Jane Doe admits she voluntarily left John Doe's room without any assistance after her friend entered the room *Id.,* pp.30, 41, 95; and

(l) Regarding alcohol, Jane Doe admits: (1) drinking alcohol approximately 3 hours prior to meeting John Doe; (2) not discussing her alcohol consumption with John Doe; (3) not consuming any alcohol in the presence of John Doe; (4) making no claim when first interviewed by IUPD that she was incapacitated or significantly impaired by alcohol when she was with John Doe. *Id.,* pg.29.

3

7. Upon information and belief, [2] Jane Doe acted with malice when she falsely told IU that John Doe sexually assaulted her in part because she needed an excuse to hide her embarrassment about initiating sexual contact with John Doe shortly after meeting him while visiting a friend at IU. Evidence supporting this belief includes, but is not limited to, the text messages attached at *Exhibit 1*, pp.59, 63, 76, as well as her statements to IU, which are attached at *Id.,* p 30.

8. Upon information and belief, State Defendants knew that John Doe had not sexually assaulted Jane Doe and that Jane Doe had initiated and/or consented to all physical contact with John Doe. (*See* IU Documents) [3]

9. Nevertheless, during late 2015 and early 2016, IU engaged in a gender-biased investigation of John Doe, which culminated in John Doe's unlawful suspension from IU. In doing so, State Defendants violated John Doe's Constitutional rights under the Indiana and United States' Constitutions, Title IX, and/or IU's disciplinary policies which include, but are not

---

[2] It should be noted, the "information and belief" allegations in the Complaint are based on at least the following two factors: (1) the evidence referenced and/or exhibits attached to this Complaint which provide a plausible basis for Plaintiff's "information and belief" allegations; and (2) John Doe's belief that Defendants are in possession and/or control of additional evidence supporting Plaintiff's "information and belief" allegations that John Doe believes he will obtain in discovery. John Doe made a good faith effort to obtain this information through a public records request, but IU refused to produce much of the requested information. *Exhibit 4 (*containing Affidavit of Ellen Foell).

[3] On March 2, 2016, John Doe requested IU produce documents and audio recordings related to Jane Doe's allegations. *Exhibit 2* (containing John Doe's Request to IU pursuant to FERPA). But, IU refused to provide John Doe with these documents or the audio recordings. Instead, IU required John Doe to travel from North Carolina to review the documents and listen to the audio recording of his hearing without being permitted to make any copies or recordings. *Exhibit 3(a) and 3(b)* (containing 3/11/2016 emails between John Doe and IU). Then, on May 12, 2016, after John Doe traveled across the country, IU sent John Doe some documents responsive to his request. However, John Doe was not provided a complete copy of the documents or the audio recording of the hearing. For example, IU's response to John Doe's FERPA Request, did not include numerous documents included in this Complaint and attached as *Exhibits 18, 21, and 23.* As a result, John Doe's Complaint is based, in part, on his recollection of all documents and audio recording in IU's file, which will be collectively referred to as "IU Documents."

4

limited to, policies such as IU's Code of Student Rights, Responsibilities & Conduct ("CSRRC") http://studentcode.iu.edu/about/index.html (accessed 6/22/16), in particular CSRRC: Responding to Incidents Involving Allegations of Sexual Misconduct by Other Students (*Exhibit 1*, pp.87-90); IU's Sexual Misconduct Policy (*Exhibit 5*); and IU's anti-discrimination policies  http://trustees.iu.edu/resources/non-discrimination-policy.shtml (accessed 6/22/16)  (These IU policies and any IU policy applicable to John Doe's disciplinary procedure are collectively referred to as "IU Policies").

### THE HISTORY OF IU'S UNLAWFUL DISCIPLINE OF JOHN DOE

10. On April 11, 2011, the United States Department of Education's ("DOE") Office of Civil Rights ("OCR") sent a "Dear Colleague" letter to colleges and universities with instructions on how to comply with Title IX when investigating and resolving complaints of sexual misconduct. ("2011 Dear Colleague Letter") (available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html accessed 6/29/16).  This letter echoes the mandates of President Obama's Administration that Colleges like IU equate "victim/complainants" in sexual misconduct proceedings as being females who must receive preferential treatment.  For instance, the 2011 Dear Colleague Letter:

    a)  states: "1 in 5 *women* are victims of completed or attempted sexual assault while in college' . . . [a]dditionally, the likelihood that a *woman* with intellectual disabilities will be sexually assaulted is estimated to be significantly higher than the general population.  The Department is deeply concerned about this problem . . . ." *2011 Dear Colleague Letter*, p.2 (emphasis added);

    b)  warns that "the majority of campus sexual assaults occur when *women* are incapacitated, primarily by alcohol." *Id.,* (emphasis added);

    c)  suggests educational institutions seek grants from the U.S. Department of Justice's Office on Violence against *Women* which require institutions "develop victim

service programs and campus policies that ensure victim safety, [and] offender accountability. . . ." *Id.,* p.19 (emphasis added); and

    d) warns education institutions that they must "never" view the "victim at fault for sexual violence" if she has been using "alcohol or drugs." In fact, OCR asks "schools to consider" providing students who violate alcohol or drug policies with amnesty if they allege they were sexually assaulted while consuming alcohol or drugs. *Id.* p.15;

11. In order to provide females preferential treatment, the 2011 Dear Colleague Letter also imposed numerous mandates to make it more difficult for males accused of sexual misconduct to defend themselves. For example, the 2011 Dear Colleague Letter required schools adopt the lowest burden of proof—"more likely than not"—in cases involving sexual misconduct, including assault. Several colleges had been using "clear and convincing" and some, like Stanford, applied the criminal standard, "beyond a reasonable doubt." The 2011 Dear Colleague Letter also mandated schools "minimize the burden on the complainant." *The 2011 Dear Colleague Letter*, pp.15-16.

12. Similarly, on April 29, 2014, OCR published a document signed by OCR's assistant secretary of education Catherine E. Lhamon ("Sec. Lhamon") titled "Questions and Answers on Title IX and Sexual Violence." ("OCR's 2014 Q&A") (available at http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf accessed 6/29/16). OCR's 2014 Q&A continued OCR's quest to hamper students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them. For example, OCR's 2014 Q&A states schools:

    a) "[M]ust not require a complainant to be present" at sexual misconduct disciplinary hearings." *OCR's 2014 Q&A,* p.30;

    b) May decide to eliminate all opportunities for "cross-examination." *Id.,* p.31; and

c) Must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event." *Id.,* pp.30, 38.

13. Neither OCR's 2014 Q&A nor the 2011 Dear Colleague Letter were subject to notice-and-comment rulemaking, and therefore their validity as binding law is at best questionable. As a result, Senator James Lankford wrote to the DOE on January 7, 2016 to express his concerns that the DOE's Dear Colleague letters are not interpretive, but are unlawfully altering the regulatory and legal landscape of Title IX and the U.S. Constitution. https://www.thefire.org/sen-james-lankford-letter-to-the-education-department/ (accessed 8/21/16). Following Senator Lankford's letter, Representative Earl Ehrhart from Georgia filed a lawsuit against the DOE on April 21, 2016 in the United States District Court for the Northern District of Georgia alleging that the DOE's implementation of the 2011 Dear Colleague letter was unconstitutional and unlawful. *See* http://www.saveservices.org/wp-content/uploads/Ehrhart-v.-DOE-2016.pdf (accessed 6/29/16).

14. Similar allegations were made against DOE in two federal lawsuits.  The first is *Neal v. Colorado State Univ.-Pueblo, et al., Case No. 1:16-cv-00873,* which was filed on April 19, 2016 in the United States District Court for the District of Colorado.  The second is *John Doe v. Lhamon et al.,* which was filed in United States District Court for the District of Columbia. (*Exhibit 6*).  This Complaint contains the following information about how OCR is pressuring colleges around the county to make it more difficult for male students' accused of sexual misconduct to defend themselves:

a) "Princeton University . . . continue[d] to use a 'clear and persuasive evidence' standard after publication of the [2011 Dear Colleague Letter.  As a result] OCR informed Princeton in a letter dated November 5, 2014 that its policy 'did not provide for an adequate, reliable and impartial investigation.' In a 'Resolution Agreement' accompanying that letter, OCR required Princeton to adopt 'the proper

standard of review of allegations of sexual misconduct (preponderance of the evidence).'"

b) " . . . in a letter dated December 30, 2014, OCR informed Harvard Law school (HLS) that the sexual misconduct policy it continued to use after publication of the [2011 Dear Colleague Letter] *improperly* used a 'clear and convincing' evidence standard of proof in its Title IX grievance procedures, *in violation of Title IX*. [emphasis in original]. The letter confirmed elsewhere that '[t]his higher standard of proof was inconsistent with preponderance of the evidence standard required by Title IX for investigating allegations of sexual harassment or violence,' by January 15, 2015, procedures 'that comply with the applicable Title IX regulations and OCR policy,' which procedures must include, among other things, '[a]n explicit statement that the preponderance of evidence standard will be used for investigating allegations of sexual harassment or violence."

c) "In a letter dated October 31, 2013, OCR notified the State University of New York (SUNY) System that '[t]he grievance procedures used by' Buffalo State 'do not specify whether the arbitrator should use the preponderance of evidence standard in investigating allegations of sexual harassment' and further that Morrisville State College 'fail[ed] to . . use the preponderance of the evidence standards to investigate allegations of sexual harassment." It ordered the SUNY System to 'revise the SUNY system grievance procedures to ensure that these comply with the requirements of Title IX; including using the preponderance of evidence standard to investigate allegations of sexual misconduct.'"

d) "OCR has ordered at least two schools to adopt grievance procedures that explicitly forbid parties from directly cross-examining each other in sexual misconduct disciplinary proceedings despite the fact that the [2011 Dear Colleague Letter] states that personal cross-examination is only 'strongly discouraged.'"

e) "in a Resolution Agreement with Rockford University signed on April 24, 2015, OCR required Rockford University to present to OCR for review a draft Title IX policy that stated, among other things, that 'the parties may not personally question or cross-examine each other during the hearing.'"

f) " . . . in a resolution agreement with Southern Virginia University entered on or around December 23, 2014, OCR required Southern Virginia University to draft, by March 31, 2015, Title IX grievance procedures that stated, 'if cross-examination of parties is permitted . . . the parties will not be permitted to personally question or cross-examine each other.'" *Id.*, pp. 13-15, ¶¶47-52.

15. As a result, IU has treated the 2011 Dear Colleague Letter as law and revised IU policies

accordingly. http://www.idsnews.com/article/2015/04/call-for-consent (accessed 6/29/16).

16. This may be because in February 2014, Sec. Lhamon told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents suggested afterward that there were "crisp marching orders from Washington." *See, Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases, Chronicles of Higher Education, February 11, 2014,* located at http://chronicle.com/article/Colleges-Are-Reminded-of/144703/ (accessed 6/29/16) .

17. Consistent with this message from Sec. Lhamon, in March 2014, IU became ensnared in an investigation by DOE's OCR because of its handling of sexual assault and harassment complaints.  (*Exhibit 7* containing DOE Announcement of Higher Education Institutions Investigation); http://news.iu.edu/releases/iu/2014/05/iu-responds-to-department-of-education-claims-of-title-ix-investigation.shtml (accessed 6/29/16).  DOE's OCR opened a second investigation into IU's sexual assault and harassment policies in June 2015. http://www.idsnews.com/article/2016/02/iu-currently-under-two-title-ix-investigations (accessed 6/29/16). Upon information and belief, IU may face another investigation from the DOE because an IU student filed a complaint with DOE's OCR alleging IU did not adequately investigate her sexual assault allegations, in part because Defendant Casares was biased due to sexual assault allegations brought against him.[4]

---

[4] Upon information and belief, IU effectively terminated Casares based on the allegations made against him. Briefly, Casares was accused of sexually assaulting a colleague at a higher education conference after she had too much to drink in December 2015. After news of this accusation became public, Tony Paganelli, Casares' lawyer, released a statement calling the allegations against Casares false. According to the statement, IU officials had concerns about whether Casares could credibly preside over student sexual assault investigations after having been publicly accused of sexual assault himself. "IU therefore asked him to resign his position or be terminated," according to the statement. http://www.huffingtonpost.com/entry/jason-casares-resigns-sexual-assault_us_56d081d1e4b03260bf769320  (accessed 6/30/16).  Casares later wrote in a blog post that IU's handing of the false allegations against him put IU: "in an unenviable position of choosing sides

http://www.idsnews.com/article/2016/03/iu-student-files-federal-title-ix-complaint

(accessed 6/29/16).

18. Upon information and belief, OCR's investigations of IU involve complaints filed by females who claimed IU failed to discipline males adequately for sexual misconduct. Evidence supporting this belief, includes, but is not limited to, OCR's heavily redacted June 7, 2016 response to a Freedom of Information Act Request ("FOIA") (*Exhibit 9*). OCR's FOIA response identifies at least two gender based Complaints out of four complaints against IU which – when references to gender are not completely redacted – prove females filed the complaints. *See generally, Id.*, pp. 38, 64 (referring to complainants in two OCR investigations as "her"); *Id.,* p.68 (detailing how a female complainant alleged defects in IU's handling of her complaint of sexual violence by another student); *Id.,* p. 38 (same).

19. At all times relevant to this Complaint, IU's investigations by DOE's OCR were ongoing. Upon information and belief, during these investigations, OCR pressured IU to equate "complainants" in sexual misconduct proceedings as being females who must receive preferential treatment.  Unfortunately, IU is only one of many institutions subject to these types of OCR investigations.  *See e.g.,* Nick Anderson, *Tally of Federal Probes of Colleges on Sexual Violence Grows 50 Percent Since May,* WASH POST, Oct. 19. 2014,

---

between loyalty and brand." In making this comment, Casares details IU's willingness to protect its "brand" even if it means punishing someone who has been falsely accused of sexual misconduct. http://jasoncasares.blogspot.com/2016/04/faith-and-belief-in-system-my-story-my.html.  (*Exhibit 8,* containing Casares' blog). The evidence proves Casares' "brand" concerns are accurate in part because after Casares' employment at IU ended, IU performed a perfunctory review of 17 sexual assault cases in which Casares was involved to determine if there was any bias against female students and found no such bias.  As  a  result,  the  decision  in  all  17  cases  remained  the  same. http://www.idsnews.com/article/2016/04/jason-casares-will-not-face-criminal-charges (accessed 6/30/16)

https://www.washingtonpost.com/local/education/tally-of-federal-probes-of-colleges-on-sexual-violence-grows-50-percent-since-may/2014/10/19/b253f02e-54aa-11e4-809b-8cc0a295c773_story.html (accessed 6/21/16); http://projects.chronicle.com/titleix/cases (containing database of information related DOE's Title IX investigations of colleges and universities since 2011 accessed 6/21/16).

20. OCR's investigations primarily involve females alleging the universities they attend condone sexual harassment and/or sexual violence by males. These complaints by female students have triggered OCR investigations of academic institutions that include, but are not limited to: (i) the University of Virginia; (ii) Southern Methodist University; (iii) Yale University; (iv) George Washington University; (v) Tufts University; and (vi) the University of Montana in Missoula. *See generally,* http://www2.ed.gov/documents/press-releases/university-virginia-letter.pdf (containing OCR's letter to the University of Virginia regarding OCR's Title IX investigation (accessed 6/21/16); http://www2.ed.gov/documents/press-releases/southern-methodist-university-letter.pdf (containing OCR's letter to Southern Methodist University regarding OCR's Title IX investigation accessed 6/21/16); http://www2.ed.gov/about/offices/list/ocr/docs/investigations/01112027-a.html (containing OCR's letter to Yale University regarding OCR's Title IX investigation accessed 6/21/16). http://www2.ed.gov/about/offices/list/ocr/docs/investigations/11112079-a.pdf (containing OCR's letter to George Washington University regarding OCR's Title IX investigation (accessed 6/21/16); and http://www2.ed.gov/about/offices/list/ocr/docs/investigations/01102089-a.html

(containing OCR's letter to Tufts University regarding OCR's Title IX investigation (accessed 6/21/16).

21. Many academics and organizations have raised alarms that DOE/OCR's worthwhile goal of protecting female college students from sexual misconduct has evolved into an unlawful example of federal governmental overreach that violates the rights of male students who never engaged in misconduct. *See e.g., Open Letter From Sixteen Members of Penn Law School Faculty* (Feb. 17, 2014), http://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/02/19/open-letter-from-16-penn-law-school-professors-about-title-ix-and-sexual-assault-complaints/ (accessed 6/21/16) ("Although we appreciate the efforts of Penn and other universities to implement fair procedures, particularly in light of the financial sanctions threatened by OCR, we believe that OCR's approach exerts improper pressure upon universities to adopt procedures that do not afford fundamental fairness."); Emily D. Safko, *Are Campus Sexual Assault Tribunals Fair?: The Need For Judicial Review and Additional Due Process Protections In Light of New Case Law,* 84 Fordham Law Review (2016); Barclay Sutton Hendrix, *A Feather On One Side, A Brick On The Other: Tilting The Scale Against Males Accused of Sexual Assault In Campus Disciplinary Proceedings*, 47 Ga. L. Rev. 591, (2013); Stephen Henrick, *A Hostile Environment for Student Defendants*: *Title IX and Sexual Assault on College Campuses,* 40 N. Ky. L. Rev. 49 (2013); *Rethink Harvard's Sexual Harassment Policy,* LETTER TO EDITOR, BOSTON                    GLOBE,              Oct.              15,              2015, http://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html (accessed 6/21/16); Emily D. Safko, *Are Campus Sexual Assault Tribunals Fair? The Need For Judicial Review And Additional*

*Due Process Protections In Light Of New Case Law*, 84 Fordham L. Rev. 2289 (2016);
Janet Halley, *Trading the Megaphone for the Gravel Gavel in Title IX Enforcement*,
HARV. L. REV. F. 103, 103-17, (2014); Samantha Harris, *Campus Judiciaries on Trial:*
*An Update from the Court,* HERITAGE FOUNDATION, Oct. 6. 2015;
http://www.heritage.org/research/reports/2015/10/campus-judiciaries-on-trial-an-update-from-the-courts (accessed 6/29/16); Janet Napolitano, "*Only Yes Means Yes": An Essay on*
*University Policies Regarding Sexual Violence and Sexual Assault,* Yale Law and Policy
Review Volume 33; Issue 2 (2015); Robin Wilson, *Presumed Guilty,* CHRONICLE OF
HIGHER  EDUCATION  (Sept.  3.  2014)  http://chronicle.com/article/Presumed-Guilty/148529/?cid=a&utm_medium=en   (accessed   6/29/16);  ("Under   current
interpretations of colleges' legal responsibilities, if a female student alleges sexual assault
by a male student after heavy drinking, he may be suspended or expelled, even if she
appeared to be a willing participant and never said no. That is because in heterosexual
cases, colleges typically see the male student as the one physically able to initiate sex, and
therefore responsible for gaining the woman's consent."); *Dershowitz and Other*
*Professors Decry 'Pervasive and Severe Infringement' of Student Rights,* Jacob Gershman
(May  18,  2016),  http://blogs.wsj.com/law/2016/05/18/dershowitz-and-other-professors-decry-pervasive-and-severe-infringement-of-student-rights/ (accessed 6/21/16).

22. As detailed in many of the publications cited above, OCR's investigations put millions of
dollars in federal student aid at risk. This is because DOE/OCR can impose civil penalties
and/or suspend institutions from participating in federal student financial aid programs if
DOE/OCR finds a university, such as IU, did not do enough to discipline males alleged to
have engaged in sexual misconduct with female students.  Sec. Lhamon confirmed this risk

of losing federal funds at a national conference at Dartmouth in the summer of 2014 when she said, "I will go to enforcement, and I am prepared to withhold federal funds." *See, How Campus Sexual Assaults Came to Command New Attention,* NPR, August 12, 2014 located at http://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention (accessed 6/21/16).

23. In June 2014, Sec. Lhamon told a Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . . ."  In addition, Sec. Lhamon noted:

> "If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. To revoke federal funds—the ultimate penalty—is a powerful tool because institutions receive billions of dollars a year from the federal government for student financial aid, academic resources and many other functions of higher education. OCR has not had to impose this severe penalty on any institution recently because our enforcement has consistently resulted in institutions agreeing to take the steps necessary to come into compliance and ensure that students can learn in safe, nondiscriminatory environments."

http://www.help.senate.gov/hearings/sexual-assault-on-campus-working-to-ensure-student-safety (accessed 8/21/16).

24. For IU, the withdrawal of federal funding would be catastrophic in part because, upon information and belief, IU Bloomington's undergraduate students received approximately $27,000,000 in Pell Grants and over $79,000,000 in Federal Student Loans in 2015. *See generally http://nces.ed.gov/collegenavigator/?q=indiana+university&s=all&id=151351* (accessed 6/21/16).

25. As detailed in some of the publications cited above, OCR investigations put immediate and tremendous pressure upon universities and State Defendants to: (a) severely discipline male students alleged to have engaged in sexual misconduct regardless of their innocence, and

(b) equate "victim/complainants" in sexual misconduct proceedings as being females who must receive preferential treatment.

26. Upon information and belief, OCR pressured IU to change its burden of proof for sexual misconduct offenses from clear and convincing to a preponderance of the evidence standard.  Upon information and belief, IU agreed to this change to make it easier for employees such as Individual Defendants to: (a) find accused male students responsible in sexual misconduct cases, even if it meant depriving these accused male students of their Constitutional rights; and (b) equate "complainants" in sexual misconduct proceedings as being females who must receive preferential treatment in part because of pressure from the federal government.

27. Like the academics above, IU faculty raised concerns about IU's adoption of a preponderance of the evidence standard. In fact, on February 24, 2015, IU's University Faculty Council noted: "we express our serious concern about the propriety and constitutionality of the "preponderance of the evidence" standard mandated by the Office of Civil Rights; that issue remains to be resolved by the courts." http://www.indiana.edu/~ufc/docs/circulars/AY15/UFCSMResolution.pdf (accessed 6/21/16).

28. The use of the preponderance of the evidence standard has also been challenged in a paper submitted by the American Association of University Professors in March 2016, shortly after John Doe was found responsible. (*Exhibit 10* containing AAUP paper).

29. Therefore, upon information and belief, pressure from governmental agencies such as OCR/DOE and/or internal forces at IU, caused State Defendants to take unlawful and gender biased disciplinary actions against John Doe. Evidence that this disciplinary action

was based on unlawful gender discrimination includes, but is not limited to IU's pattern and practice of taking unlawful disciplinary actions against male students such as Jeremiah Marshall who filed a complaint against IU in 2015. *See generally, Marshall v. Indiana Univ.,* Case No. 1:15-cv-00726, 2016 U.S. LEXIS 32999, **3-4, 18-19 (S.D. Ind. Mar. 15, 2016)(discussing how the plaintiff established a claim of "selective, gender-based enforcement" because after being charged with sexual misconduct, plaintiff informed defendant university that he "had been sexually assaulted by another female student . . . [yet] Defendants never investigated [plaintiff's] reported sexual assault.").

30. In addition, upon information and belief, IU adopted gender-biased policies and procedures for addressing complaints of sexual assault in order to avoid negative publicity that the university did not adequately handle sexual assault investigations. IU was motivated at least in part to avoid negative publicity by campus advocates, to counteract the allegations of sexual assault against Defendant Casares, and to avoid and/or limit the impact of the negative publicity.

http://www.forbes.com/sites/hbsworkingknowledge/2016/08/10/prospective-students-steer-clear-of-schools-rocked-by-scandal/#2277f4e27428

31. IU's pattern and practice of gender discrimination against male students also includes the affidavit of AF[5] in *Exhibit 11* which details how: (a) AF was falsely accused of sexual misconduct while a student at IU; (b) AF was investigated and unlawfully disciplined by IU during a disciplinary procedure that began on or about September 30, 2015 and ended on or about December 21, 2015; and (c) how IU employees including, but not limited to

---

[5] It should be noted, John Doe uses initials to identify IU students. *See generally, John Doe's Motion to Allow the Parties to Use Pseudonyms* (containing the basis for John Doe's request for using pseudonyms in this proceeding).

Defendant Casares, engaged in the gender-biased enforcement of IU Policies in part because IU failed to discipline a female who violated IU Policies by sexually assaulting AF.

32. IU's pattern and practice of gender discrimination against male students also includes the affidavit of Attorney Katherine Liell in *Exhibit 12* which detail IU's pattern and practice of discriminating against and treatly unfairly males who have been accused of sexual assault.

33. In addition, based on the information detailed in this Complaint and upon information and belief, State Defendants' unlawful discipline of John Doe occurred in part because of State Defendants' archaic assumptions that female students do not sexually assault their fellow male students because females are less sexually promiscuous than males. Evidence supporting this belief, includes, but is not limited to, State Defendants' coordinated campaign to: (a) unlawfully reject the preponderance of evidence which proved Jane Doe voluntarily initiated and/or consented to all physical contact with John Doe when Jane Doe was not incapacitated by alcohol; (b) ignore testimony by Jane Doe and/or her witnesses that established John Doe's innocence in part because that testimony was internally inconsistent and lacked credibility; and (c) unlawfully discipline John Doe for accepting Jane Doe's offer to engage in promiscuous behavior that Jane Doe, in retrospect, later regretted engaging in. (IU Documents). *See generally*, *Exhibit 1,* pp. 27-38  (discussing John Doe's Enrollment at IU and interactions with Jane Doe); and pp. 38-56 (discussing IU's Investigation and Discipline of John Doe).

34. In engaging in the conduct detailed in the preceding paragraph, State Defendants violated OCR's guidance regarding the credibility of the parties and the presence of corroborating

evidence.  *See generally, OCR's Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* ("OCR's Sexual Harassment Guide") (January 2001) (available at https://www2.ed.gov/offices/OCR/archives/pdf/shguide.pdf accessed 6/21/16).  For example, OCR's Sexual Harassment Guide recommends evaluating the "relative credibility" of evidence by looking at the level of detail and consistency of each person's account . . .  in an attempt to determine who is telling the truth. Another way to assess credibility is to see if corroborative evidence is lacking where it should logically exist." *OCR's Sexual Harassment Guide,* p.9. *See generally*, *Infra,* pp. 27-38  (discussing John Doe's Enrollment at IU and interactions with Jane Doe); and pp. 38-56 (discussing IU's Investigation and Discipline of John Doe).

35. Upon information and belief, State Defendants ignored the exculpatory evidence establishing John Doe's innocence in part because of fear that President Obama's Administration might cut off IU's access to federal funding if State Defendants did not provide preferential treatment to females such as Jane Doe.  Evidence supporting this belief includes The White House's April 2014 report entitled "Not Alone" which threatens the elimination of federal funds by stating:

> If OCR finds a Title IX violation, the school risks losing federal funds.   www.whitehouse.gov/sites/default/files/docs/report_0.pdf accessed 6/29/16)

*See also*, *Infra,* pp. 27-38 (discussing John Doe's Enrollment at IU and interactions with Jane Doe); and pp. 38-56 (discussing IU's Investigation and Discipline of John Doe).

36. The White House also noted that:

> The Justice Department (DOJ) . . .  shares authority with OCR for enforcing Title IX, and may initiate an investigation or compliance

review of schools receiving DOJ financial assistance. If schools are found to violate Title IX and a voluntary resolution cannot be reached, DOJ can . . . seek to terminate DOJ funds. www.whitehouse.gov/sites/default/files/docs/report_0.pdf (accessed 6/29/16)

37. President Obama's federal funding threats dovetail with his Administration's "It's On Us" campaign that states: "[a]n estimated one in five women has been sexually assaulted during her college years. . . ." https://www.whitehouse.gov/blog/2014/09/19/president-obama-launches-its-us-campaign-end-sexual-assault-campus (accessed 6/29/16) ;https://www.whitehouse.gov/the-press-office/2014/04/29/fact-sheet-not-alone-protecting-students-sexual-assault (accessed 6/29/16) .

38. Upon information and belief, in response to pressure from the DOE/OCR, IU joined the "It's On Us" Campaign. https://studentaffairs.indiana.edu/dean-students/sexual-violence/its-on-us/index.shtml (accessed 6/29/16). In fact, IU not only joined the "It's On Us" campaign amidst the DOE investigation, but also uses the "It's On Us" logo as the cover of its "Indiana University Office of Student Welfare & Title IX Annual Report, 2014-2015".

http://studentwelfare.iu.edu/files/docs/Office%20of%20Student%20Welfare%20and%20Title%20IX%2014-15%20Annual%20Report.pdf (accessed 6/29/16). Thus, upon information and belief, the current Title IX enforcement at IU is being largely driven by federal directives such as the "It's On Us" campaign.

39. However, IU and the Obama Administration's allegations that 20% of America's female college students are being sexually assaulted by their male counterparts is false.  For example, over 90% of the colleges and universities in the United States reported **none** of their students was raped in 2014. *See generally, Exhibit 14*.Similarly, in 2014, IU reported

22 rapes among its student body of over 38,000 students on its Bloomington Campus. In 2013, IU reported 21 rapes on its Bloomington Campus. https://protect.iu.edu/police-safety/annual-reports/ (accessed 6/21/16) *See also,* https://www.indiana.edu/about/rankings-statistics.html (accessed 6/21/16); http://ope.ed.gov/security/InstList.aspx (accessed 6/21/16).

40. Nevertheless, IU routinely portrays a large portion of their male students as sexual predators. For example, IU relied on its October 2015 Sexual Assault Climate Survey, in which only 17% of the student population participated, to publicize via its website, a news release and a letter from the President and Provost that IU's statistics mirror the statistic that 1 in 5 college women are raped. http://stopsexualviolence.iu.edu/ (accessed 6/21/16).

41. Similarly, even though academic studies suggest a high percentage of rape allegations are false,[6] IU informs its employees that "1 in 5 women report a sexual assault during their

---

[6] *See e.g.,* Edward Greer, *The Truth behind Legal Dominance Feminism's Two-Percent False Rape Claim Figure,* 33 Loy. L.A.L. Rev. 947(2000); http://r.search.yahoo.com/_ylt=A0LEVrdNvHZXx3UAa7AnnIlQ;_ylu=X3oDMTEyY241aGc1BGNvbG8DYmYxBHBvcwMxBHZ0aWQDQjIzNDFfMQRzZWMDc3I-/RV=2/RE=1467428045/RO=10/RU=http%3a%2f%2fdigitalcommons.lmu.edu%2fcgi%2fviewcontent.cgi%3farticle%3d2216%26context%3dllr/RK=0/RS=.kUz8FO96RCLAQlabKJBDnbww1g-  For example, Greer writes, "It is indisputably true that, largely through the efforts of legal dominance feminists, there now exists a consensus among legal academics that only two percent of rape complaints are false. This purportedly empirical statement is ubiquitously repeated in legal literature. Dozens of law review articles reiterate that no more than one in fifty rape complaints is false. This empirical fact, however, is an ideological fabrication." *Id.* Then, in an extremely detailed study of "academic archeology" Greer shows how this 2% figure is not based on known academic studies at all but rather it is based on , "feminist publicist Susan Brownmiller's interpretation of some data, now a quarter-century old (1974), of unknown provenance from a single police department unit. There are no other published studies that this author could find...Whether that original source was a press release, a more formal report, or simply an oral statement to a reporter, remains lost in antiquity." *Id. See also,* Eugene J. Kanin, *False Rape Allegations* Archives of Sexual Behavior, Vol. 23 No.1 (1994) available https://archive.org/details/FalseRapeAllegations (accessed 6/29/16).  Kanin's report appears in a peer reviewed journal. In summary, his study found that in a small Midwestern city, 41% of all rape charges were false accusations, that is, admittedly false by the complainants themselves. There is an addendum to the article describing how they then repeated their study at two Midwestern universities and found the number to be 50%.  The report goes on to note: "[i]n 1988, we gained access to the police records of two large Midwestern state universities. With the assistance of the chief investigating officers for rape offenses, all forcible rape complaints during the past 3 years were

undergraduate college experience." http://stopsexualviolence.iu.edu/employee/index.html (accessed 6/29/16). In addition, in March 2016, IU provided training to its faculty implying that 33% of senior collegiate women have been the victims of sexual violence during their undergraduate experience. http://nsse.indiana.edu/pdf/presentations/2016/NASPA_2016_Hurtado_BrckaLorenz_slides.pdf (accessed 6/21/16).

42. Although State Defendants will likely allege IU's enforcement of sexual misconduct policies and the White House's "It's On Us" campaign are gender neutral, both are irreparably tainted by gender bias against male students. http://news.indiana.edu/releases/iub/iu-in-the-news/dnb-10-21-2015.shtml (accessed 6/21/16).  For example, IU reports that for sexual assaults "[w]omen are largely the targets and men are largely the perpetrators," and that their consent education efforts are geared towards males because "[m]ore than 20 percent of all male respondents reported that people who drink heavily could still give consent." http://news.indiana.edu/releases/iub/iu-in-the-news/dnb-10-21-2015.shtml (accessed 6/21/16).

43. In addition, Vice President Joe Biden has made it clear that the purpose of the "It's On Us" campaign is to protect female students from male students. *See e.g.,* https://www.osu.edu/buckeyesact/vpbidenvideo.html (accessed 6/21/16). VP Biden also made it clear that President Obama's Administration and the DOE used Title IX investigations and potential loss of federal funding to encourage university presidents to

---

examined. Since the two schools produced a roughly comparable number of rape complaints and false rape allegations, the false allegation cases were combined, n = 32. This represents exactly 50% of all forcible rape complaints reported on both campuses. Quite unexpectedly then, we find that these university women, when filing a rape complaint, were as likely to file a false as a valid charge."

join the campaign. *Id.* In addition, VP Biden encourages "guys" to take the "It's On Us" pledge to combat the fact that 1 in 5 college women are the victim of sexual assault while attending college. *Id.*

44. As a result, IU encourages its faculty, staff and students to take the "It's On Us" pledge which seeks to protect female students from male students with statements such as:

    a.  "It's on us to make sure *guys* know that if *she* doesn't or can't consent to sex, it's sexual assault*." See generally,* http://itsonus.org/index.html#pledge (accessed 6/21/16)*;* https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=2&ved=0CCMQFjABahUKEwjW2vihqpbJAhUI02MKHeaeC94&url=http%3A%2F%2Fitsonus.org%2Fassets%2Ffiles%2FIt%27s_On_Us_Organizing_Guide_Fall_2015.pdf&usg=AFQjCNGy24MM2vn7-N7HwwUnshc6d6q0gQ&sig2=nlpOPMfxwODg7eSMWYrbxA&cad=rja (accessed 6/21/16) (emphasis added);

    b.  Suggesting individuals videotape themselves "[s]ay[ing] to camera…it's on us to recognize that if a *woman* doesn't or can't consent to sex, it's rape." *Id.,* (emphasis added);

    c.  Stating: "*Never* blame the victim," "*always* be on the side of the survivor," and "*trust* the survivor." *Id.,* (emphasis added);

    d.  VP Biden's statement that those that make their rape allegations public "give millions of women hope." *Exhibit 15*, containing It's On Us Twitter Page, ; and

    e.  President Barack Obama's statement on International Day for the Elimination of Violence Against Women that: "…together we can change our culture for the better by ending violence against *women and girls*…IT'S ON US…" ; *Exhibit 16* (containing page from It's On Us Facebook page) (emphasis added).

45. Similarly, The White House's April 2014 report entitled "Not Alone" also asserts at page 5: "[o]ne in five women is sexually assaulted in college." https://www.notalone.gov/assets/report.pdf (accessed 6/30/16).

46. According to IU's website, there are 38,364 undergraduates enrolled at IU's main campus, approximately 51% of which are female. https://www.indiana.edu/about/rankings-statistics.html (accessed 6/21/16). Therefore, if the one in five statistic were applicable,

approximately 7,673 female IU students would be sexually assaulted during their four-year

stay at IU.  Yet, as detailed above, IU reported 43 sexual assaults for years 2013 and 2014.

47. Emily Yoffe's 2014 article in *Slate* refutes sexual assault statistics relied on by President

Obama and/or IU.  Emily Yoffe, The College Rape Overcorrection, SLATE, Dec. 7, 2014,

http://www.slate.com/articles/double_x/doublex/2014/12/college_rape_campus_sexual_a

ssault_is_a_serious_problem_but_the_efforts.html (accessed 6/29/16)  Ms. Yoffe asked

Christopher Krebs - the lead author of the study cited by President Obama - whether his

study represented the experience of the approximately 12 million female students in

America.  *Id.*  Mr. Krebs stated those involved in the study, "don't think one in five is a

nationally representative statistic." *Id.*  This was because Mr. Krebs stated his sampling of

only two schools "[i]n no way . . .  make[s] our results nationally representative." *Id.  See*

*also,* Heather MacDonald, *An Assault on Common Sense,* The Weekly Standard, Nov. 2,

2105,      http://www.weeklystandard.com/an-assault-on-common-sense/article/1051200

(accessed 6/21/16) (detailing why a recent survey conducted by Association of American

Universities has been improperly distorted to falsely suggest large percentages of female

college students are being sexually assaulted on America's college campuses).

48. Ms. Yoffe also noted that if the "one-fifth to one-quarter assertion [regarding sexual

assaults on college campuses were accurate that] would mean that young American college

women are raped at a rate similar to women in Congo, where rape has been used as a

weapon of war."  Emily Yoffe, The College Rape Overcorrection, SLATE, December 7,

2014,

http://www.slate.com/articles/double_x/doublex/2014/12/college_rape_campus_sexual_a

ssault_is_a_serious_problem_but_the_efforts.html (accessed 6/21/16). And, Ms. Yoffe

debunked the sexual assault statistics relied on by President Obama and/or IU by discussing a:

> "special report from the Bureau of Justice Statistics title 'Rape and Sexual Assault Victimization Among College-Age Females, 1995-2013' . . . [which] found that contrary to frequent assertions by some elected officials, about the particular dangers female college students face, they are less likely to be victims of sexual assault than their peers who are not enrolled in college. The report found . . . the incidence [of sexual assault] . . . was far lower than anything approaching 1 in 5: 0.76 percent for nonstudents and 0.61 percent for students." Emily Yoffe, The Problem with Campus Sexual Assault Surveys, SLATE, Sept. 24, 2015. http://www.slate.com/articles/double_x/doublex/2015/09/aau_cam pus_sexual_assault_survey_why_such_surveys_don_t_paint_an_a ccurate.html (accessed 6/29/16)

49. IU's legitimate goal of preventing sexual assault is *not* the issue in, nor is it the basis for, this Complaint. Rather, this Complaint addresses State Defendants' unlawful and/or gender biased discipline of innocent male students like John Doe via sexual misconduct proceedings that afford females unconstitutional preferential treatment.

50. State Defendants' unlawful actions and/or gender bias has created a hostile environment which in turn creates an adverse educational setting in violation of Title IX in part because IU engages in sex stereotyping discrimination based on unlawful notions of masculinity and femininity. This hostile environment causes innocent males on IU's campus to be unlawfully disciplined and interferes with males' ability to participate in or benefit from various activities including learning on campus.

51. Although State Defendants may allege IU Policies are gender neutral, this is a pretext for State Defendants' anti-male discrimination implemented to discipline innocent male students like John Doe via sexual misconduct proceedings that afford females

unconstitutional preferential treatment.   Evidence exposing this pretext includes, but is not limited to:

a) IU's "SlutWalk Bloomington" which depicts males in a gender biased light regarding sexual misconduct while empowering women against "slut-shaming" by males. http://www.idsnews.com/article/2015/04/call-for-consent (accessed 6/21/16) (discussing same). This message was reinforced by IU's Title IX Coordinator Emily Springston who spoke at the event to a backdrop of gender-biased signs such as: "[a] little girl's dress does not make a pedophile the same way a big girl's dress does not make a rapist."   After Ms. Springston spoke, IU's Crisis Intervention Services Coordinator perpetuated the event's anti-male stereotypes by discussing how females are unfairly "labeled as sluts . . . whores . . . bitches and . . . monsters." These anti-male stereotypes were echoed by other statements at the event, such as, "Trad youth can fall off a white male orthodox cliff." *Id.*

b) In addition, IU's "It's on Us" promotional efforts focus on females as victims, and males as assailants.  These efforts include but are not limited to, showing the film "It Happened Here" with discussion afterward led by Leslie Fasone, IU Dean of Students, and Defendant Monroe, Office of Student Ethics, which:

   (1)  Contains interviews of victims of sexual assault—all of whom are women;

   (2) Advances anti-male stereotypes such as "men feel entitled to do what they want to a woman's body";

   (3) Details how when female college students make allegations of sexual misconduct, the universities' role is *not* to "question her credibility but have an obligation to treat her as credible."

   (4) Characterizes male students as sexual predators who must be severely disciplined because they are sexually assaulting 1 in 5 college women.

http://www.ithappenedhere.org/ (accessed 6/30/16).

c) In addition, IU's efforts included showing the film "The Hunting Ground", a film about campus sexual assault that purports to be a documentary but is in fact misleading and biased, sponsored by the Dean of Students Office, with a panel discussion after the film. "The Hunting Ground" has been widely criticized:

(1) Nineteen Harvard University professors denounced the film as "propaganda" that is "one-sided" and "biased." *(Exhibit 17,* containing Harvard University Law School Press Release);

(2) Claims to be a documentary but is biased; *"We don't operate the same way as journalists — this is a film project very much in the corner of advocacy for victims, so there would be no insensitive questions or the need to get the perpetrator's side" — The Hunting Ground co-producer Amy Herdy; See,* http://www.nationalreview.com/article/427166/hunting-ground-smoking-gun-e-mail-exposes-filmmaker-bias-against-accused (accessed 6/29/16);

(3) Features three women, whose claims of sexual assault were later largely discredited, including in one case fabricating evidence (a bloody condom that when eventually tested contained DNA of another male who was not the alleged assailant); *See*, http://www.slate.com/articles/news_and_politics/doublex/2015/06/the_hunting_ground_a_closer_look_at_the_influential_documentary_reveals.html (accessed 6/30/16); http://www.nationalreview.com/article/415269/cinematic-railroading-jameis-winston-stuart-taylor-jr (accessed 6/30/16), and http://www.thedailybeast.com/articles/2015/02/03/columbia-student-i-didn-t-rape-her.html (accessed 6/30/16).

(4) Repeatedly omits the word "alleged," thus confusing an accusation of sexual assault with a proven case, and does not offer any meaningful opportunity for the accused to respond to the charges, as would be expected in any fair, balanced documentary.

(5) Makes the false claim that one in five college women are sexually assaulted, even though the U.S. Department of Justice reports a woman's risk is less than one percent (0.61%) each year.

Altogether, the information detailed above manifests IU's pattern and practice of: (a) providing preferential treatment to females – like Jane Doe - who allege they were sexually assaulted my male students; and (b) imposing presumptions against male students – like

John Doe – who are falsely accused of sexual misconduct.  In addition, the allegations detailed above, and the allegations to follow specific to John Doe, demonstrate that IU was motivated by pro-female, anti-male bias that was, at least in part, adopted to refute criticism within the student body and public press that IU was turning a blind eye to female complaints of sexual assault.

### JOHN DOE'S ENROLLMENT AT INDIANA UNIVERSITY AND INTERACTIONS WITH JANE DOE

52. John Doe is a male from North Carolina, where he worked diligently in high school, graduated with a good academic record (3.7/4.0) and scored 2010 on the SAT, a standardized college entrance examination.

53. Setting his sights on a college education from a top ranked college, John Doe was excited to accept an offer to attend IU, which also included admission to a selective educational program at IU.  John Doe began his studies in the fall of 2015. At all times relevant John Doe was qualified to be a student at IU.

54. John Doe was a student at IU in Bloomington, Indiana until IU wrongfully found him responsible of sexual assault and unlawfully suspended him from January 27, 2016, until May 6, 2017.

55. Defendant Jane Doe, upon information and belief, is a student at Butler University, located in Indianapolis, Indiana and began her studies at Butler in the fall of 2015.

56. On October 17-18, 2015, Jane Doe went to IU to spend the weekend visiting her friend with the initials GJ.  GJ was a freshman at IU and lived in the same dormitory and on the same floor as John Doe. During their visit, Jane Doe and GJ spent the weekend partying and drinking alcohol at IU even though neither Jane Doe nor GJ were of legal age to consume alcohol.

57. Upon information and belief, and based upon Jane Doe's text messages during the weekend of October 17-18, 2015, Jane Doe was seeking to have sex, or at least seeking to hook up with male IU Students. (*Exhibit 1,* pp. 71, 74.)  As an example, Jane Doe sent a text to friend complaining that she, "almost suck [sic] this guy, but [GJ] say no." *Id*., pg. 73.

58. On October 18, 2015, GJ and Jane Doe attended two parties with another mutual friend with the initials RD. Jane Doe consumed alcohol at the first party only, which started at approximately 11:00 p.m. and ended approximately 11:30 p.m. *Id., pp. 95,100.* By her own account, Jane Doe did not consume any additional alcohol after this time.  *Id.*  After drinking at this party, Jane Doe and her friend GJ went to a second party before returning GJ's dormitory by bus at approximately 1:50 am without Jane Doe accomplishing her goal of hooking up with a male IU student.  *Id., pp. 73, 95*

59. At approximately 2:30 am, some three hours after her last use of alcohol, Jane Doe and GJ left her room in the dorm to go into the hallway to get a drink of water and saw John Doe in the hallway.  John Doe was returning to his room after spending time with friends where he had two or three beers but was not intoxicated.  Jane Doe, John Doe and GJ engaged in small talk, including discussions about their backgrounds and their studies. Jane Doe and John Doe connected over the fact that they were both from the South but were attending colleges in Indiana.

60. During this conversation, which included specific topics such as whether there was such a thing as "southern hospitality", John Doe's interest in Civil War history, and different music groups that each liked, Jane Doe exhibited no signs of being incapacitated or being unable to make decisions due to drug or alcohol impairment. For instance, Jane Doe walked without stumbling or assistance, spoke without slurring her words, was not vomiting, was

conscious and focused, engaged in a full and intelligent conversation, and was fully aware of her surroundings.

61. Jane Doe asked John Doe if she and GJ could go into John Doe's dorm room. John Doe accepted Jane Doe's request and the three freshman went into John Doe's dorm room.

62. Upon entering John Doe's room, Jane Doe sat closely next to John Doe on his bed and continued flirting with him while GJ sat on the floor facing Jane Doe and John Doe. Shortly thereafter, GJ stated she wanted to leave so Jane Doe and John Doe could be alone, talk, and "maybe make out." (*Id.,* pg. 30).

63. Once alone in the room, Jane Doe and John Doe started kissing. *Id.,* pg. 33, 36. Jane Doe initiated and enjoyed the kissing. *Id.,* pp. 33, 41.  With permission, John Doe started to remove Jane Doe's pants, with Jane Doe's help, and John Doe digitally stimulated Jane Doe's vagina. Jane Doe asked John Doe to get a condom, which he did by getting up from the bed and walking over to his desk. *Id.,* pg.33. After getting the condom, John Doe asked Jane Doe to put the condom on his erect penis, but Jane Doe replied that she did not know how to do that and asked him to put the condom on instead. *Id.,* pg.33, 36, 95.  Jane Doe then watched as John Doe put the condom on his penis. Then, Jane Doe asked John Doe to turn off the light, which he did. *Id.,* pp. 33, 36.

64. The two resumed kissing and began sexual intercourse. Jane Doe initiated the sexual intercourse by guiding John Doe's penis into her vagina with her hand. While engaging in sexual intercourse, Jane Doe moaned and made noises of pleasure. *Id.,* pg. 33. In addition, Jane Doe's non-verbal actions during sexual intercourse, which also included kissing John Doe and holding her arms around him, signaled to John Doe that Jane Doe was enjoying the sexual intercourse at all times. These mutually understandable actions confirmed Jane

29

Doe's earlier verbal indications of consent which led to intercourse, including but not limited to, her request to turn out the lights, asking John Doe to get a condom and asking him to put the condom on himself,. Moreover, Jane Doe admitted that she never told John Doe that she did not want to have sexual intercourse and never asked him to stop the sexual intercourse once it started. *Id.,* pg.36.

64. In fact, during sexual intercourse, Jane Doe did not say anything to John Doe to indicate in any way that she wanted the sexual activity she initiated to stop. Indeed, all her actions and sounds indicated in a mutually understandable way that she was enjoying the sexual intercourse and wanted it to continue. In fact, as described below, Jane Doe told both Officer Collins and Defendant Monroe that she asked John Doe to answer the door because she knew GJ would not stop knocking on the door unless John Doe answered it. *Id.,* pp. 30, 95  Prior to that moment, Jane Doe did not tell John Doe that she did not want to engage in sexual intercourse, did not push him away at any point, and did not tell him to stop the sex once it began. Rather, all of her actions indicated that the sex was consensual. *Id.,* pg. 33

65. Sometime after Jane and John Doe started intercourse, GJ started knocking on John Doe's door.  Jane Doe asked John Doe to get the door, stating she assumed it was GJ and she knew that GJ would not stop knocking. Jane Doe told IUPD Ofr. Collins that asking John Doe to get the door was, "her way of letting him (John Doe) know that she did not want *to continue* having intercourse." *Id.*, pg. 30.  In other words, Jane Doe admitted to IUPD Ofr. Collins, the first officer to interview her, that the sexual intercourse she initiated with John Doe was consensual up until the point that she asked John Doe to get the door, at which point she no longer wanted *to continue* having sex. And even though her verbal request

was not communicated to John Doe as a withdrawal of consent, he immediately complied with Jane Doe's request to get the door and the two stopped having intercourse. *Id.,* pp. 36, 95.

66. Upon Jane Doe's request to get the door, John Doe immediately stopped the sexual intercourse, put on his boxers and answered the door. GJ was at the door with a friend with the initials BM. Jane Doe had never met BM before the night of October 18, 2015. *Id.,* pg. 102. When GJ entered the room, Jane Doe quickly put her pants on by herself and walked unassisted to the bathroom outside of the room directly across the hallway. *Id.,* pp. 30, 41, 44. Jane Doe did not exhibit any signs of being distraught, though her behavior of quickly pulling up her pants and leaving for the bathroom suggested to John Doe that she was embarrassed of her actions in front of her friend (the same friend who had earlier in the night "said no" when Jane Doe "almost suck this guy.") and BM, whom she had just met. *Id.,* pg. 73. BM never entered the room and after John Doe opened the door, she left the hallway while Jane Doe was in the bathroom. After using the bathroom on her own, Jane Doe returned with GJ to her dorm room. *Id.,* pp. 30, 44.

67. John Doe spoke briefly to GJ while she was waiting for Jane Doe to finish in the bathroom. GJ told John Doe that Jane Doe would not like what had happened and that the event would never be discussed again. *Id.,* pp. 48, 100 John Doe was confused and surprised by these statements as GJ was not in the room and had no knowledge of what happened between the two, specifically that Jane Doe had initiated consensual intercourse with him. As a result, John Doe asked GJ if Jane Doe's conduct that evening was atypical for her to which GJ did not respond. *Id.,* pp. 37, 44, 95.

68. At some time, after returning to GJ's room, Jane Doe told GJ that she had lost her virginity to John Doe, telling GJ "she had done something dumb." *Id.,* pg. 44. Jane Doe got herself ready for bed, but became embarrassed and remorseful about having sex. After getting to bed, Jane Doe began texting friends expressing her embarrassment about her actions with John Doe, again saying she had done something dumb. For instance, Jane texted friends with the initials CK and RD that "*I did something dumb I had send [sic] sex Think I got raped. Okay please reply And please don't tell anyone*" … I have never been more embarrassed in my life." *Id.,* pg. 76.

69. The next morning, a student with the initials RD came to see Jane Doe and GJ and the three discussed the events of the previous evening. *Id.,* pp. 31, 44 Jane Doe was embarrassed about having engaged in sexual intercourse with John Doe, whom she had just met. According to GJ, at some point Jane Doe told her that John Doe had sex with her and that she had not consented to the sex (a statement inconsistent with Jane Doe's own testimony to IUPD Officer Collins as described above), and that after speaking together, "the two realized that Jane Doe had been sexually assaulted." *Id.,* pg. 65  To hide her embarrassment and regret regarding her own behavior and realizing that she could blame someone else rather than take responsibility for her own actions, Jane Doe maliciously embraced the inaccurate suggestion, supported by her friends, that she had been sexually assaulted and that she should pursue a police investigation.

70. Jane Doe was easily persuaded to falsely call the consensual sexual encounter a sexual assault because this false allegation addressed Jane Doe's fear that her promiscuous behavior would upset her parents.  Jane Doe expressed these concerns in her text messages to friends and in her statements to the IUPD. *Id.,* pp. 31, 38, 59, 63, 76.

71. In advancing these false claims about John Doe, Jane Doe manifested a familiar pattern evidenced by academic studies regarding the rationale behind the high percentages of false allegations of sexual assault. *See e.g.,* Reggie D. Yager, *What's Missing From Sexual Assault Prevention and Response,* (April 22, 2015), pp.46-62 http:ssrn.com/abstract=2697788 (accessed 6/21/16). Specifically, these academic studies detail how most false allegations of sexual assault occur because of: (i) the need for a cover story or alibi; (ii) retribution for a real or perceived wrong, rejection or betrayal; or (iii) desire to gain sympathy or attention. *Id.,* pp.63-65.

72. Having committed herself to these false claims, Jane Doe, RD, and GJ, went to the Bloomington Hospital so that Jane Doe could receive a Sexual Assault Nurse Examination ("SANE"). Based on IU Documents, it appears the IUPD obtained the SANE records from the hospital. But, State Defendants never gave John Doe access to Jane Doe's medical records, which included, but were not limited to the SANE documentation. Upon information and belief, these documents contain exculpatory evidence such as: (a) oral testimony by Jane Doe that contradicts her subsequent testimony to IU employees about John Doe: (b) evidence of medical tests that disprove Jane Doe's allegations against John Doe; and/or (c) documentation establishing Jane Doe's blood alcohol level was more likely than not far lower that Jane Doe and/or her witnesses subsequently alleged.

73. After going to the hospital, and at the encouragement of her friends, Jane Doe filed a report with the IUPD. Jane Doe provided a statement to Ofr. Collins of the IUPD. (*Exhibit 1,* pp. 29-31, 41-42. Notably, in the statement, Jane Doe admitted that it was not until she heard someone knocking on the door that she decided she "did not want to continue having intercourse," although this is not what she told John Doe in asking him simply to get the

door, which he did regardless. Jane Doe makes no other mention or claim at any time during her statement to Ofr. Collins that any of the kissing, fondling, or sexual intercourse up until the time her friend knocked on the door was non-consensual.  Moreover, Jane Doe did not state that John Doe forced her to have sex through threat, intimidation, or duress.  *Id.*  In fact, Jane Doe never reported any actions by John Doe to IUPD Ofr. Collins, or later to Sergeant Schmuhl, that could support an allegation that she had been sexually assaulted. Rather, Jane Doe explains only that she "did not enjoy the sex" and "did not tell John Doe to stop or make any attempt to push him away because she 'didn't want to be embarrassed.'"  *Id.,* pg. 30  Jane Doe also shared with Officer Collins concern that her parents not find out about her sexual activity.  *Id.,* 31. Lastly, while discussing the period from 11:00 p.m. to 1:00 p.m. *at the parties* she attended that night, she stated she "knows she was intoxicated and slurring her words, but she was able to walk without assistance." *Id.,*  pg. 29. But Jane Doe makes no statement to Ofr. Collins that she was intoxicated or acting in any way that could be perceived as intoxicated when she met John Doe approximately two to three hours later, after not having any alcohol to drink for approximately three hours.

74. Later that same day, Jane Doe told Sgt. Schmuhl from the IUPD that she did not want any information about her sexual activity shared with her parents *Id.,* pg. 37.

75. Shortly thereafter, Sgt. Schmuhl and Detective Koontz met John Doe at his dorm where he agreed to accompany them to the IUPD.  During his conversation with Sgt. Schmuhl and Det. Koontz, John Doe was completely shocked to learn Jane Doe was now calling the sexual encounter she had initiated and enjoyed a nonconsensual encounter.  In fact, the trauma of the false allegations caused John Doe to have to lay down on the floor at some

point during the interview and become so visibly distressed that Sgt. Schmuhl asked him if he needed to speak to a doctor at the hospital, to which he said that he did. Det. Koontz and Ofc. Hazelgrove then took John Doe to the hospital. *Id.,* pg. 34, 38.

76. A few days later on October 21, 2015, Sgt. Schmuhl conducted a second interview with Jane Doe, in which she admitted: (1) she enjoyed kissing John Doe and kissed him back; (2) that she was uncomfortable, but did not object, when John Doe removed her leggings; and (3) that Jane Doe knew something (i.e., sex) was going to happen but said nothing. *Id.,* pg. 42. These statements differed from Jane Doe's prior account to Officer Collins in significant ways. For instance, Jane Doe's statements to Sgt. Schmuhl conflicted with her statements to Ofc. Collins describing a consensual sexual encounter which Jane Doe decided to end when someone knocked on the door. Additionally, with regard to her alcohol consumption, Jane Doe contradicted her earlier statements to Ofc. Collins downplaying the role alcohol played in her interaction with John Doe.  For, Jane Doe told Sergeant Schmuhl that she consumed 4-5 shots and a beer within a twenty- minute period, that she is very social when she drinks, and that she made many calls on her cell phone. She also stated to Schmuhl, "my mind was just spinning because I was so drunk, um, and then it happened. I just didn't know what to do so I just didn't say anything." *Id.* These claims of incapacitation are entirely inconsistent with the verbal and non-verbal actions Jane Doe told Ofc. Collins and/or Sgt. Schmuhl that she engaged in on the evening in question.  These  verbal and non-verbal actions include, but are not limited to Jane Doe: (a) remembering how she initiated conversations with John Doe *Id.* pg. 30; (b) inviting herself into John Doe's room  *Id.*; (c) recalling walking and performing physical activities without assistance or evidence of impairment *Id.,* pg. 29, 30; (d) remembering enjoyable

kisses with John Doe *Id.,* pg. 30, 41; (e) recalling discussions of using a condom *Id.*; (f) remembering asking John Doe to turn off the lights (i.e. exhibiting full awareness of the situation and in fact asking John Doe to modify the environment to her liking) *Id.,* pg. 30; (g) recalling having intercourse with John Doe until the point when someone knocked on the door and Jane Doe decided she did not want to continue having intercourse *Id.*; (h) remembering asking John Doe to get the door, which he did; and (g) recalling how she put on her pants and walked to the bathroom across the hallway without assistance. *Id.*

77. Given the evidence detailed above, State Defendants knew or should have known Jane Doe understood she had voluntarily engaged in a sexual situation, which she was mentally and physically capable of initiating and that she possessed the ability to: (a) resist engaging in this activity; and/or (b) appreciate the nature of John Doe's actions. *See, Exhibit 5*. State Defendants' failure to apply IU Policies in a gender-neutral fashion in light of the facts evidences State Defendants' bias against male students such as John Doe and preference for female students such as Jane Doe.

78. Given the evidence detailed above, State Defendants knew or should have known Jane Doe violated  IU Policies which state: "… being drunk is not a free pass. If you are drunk and you perform a sexual act on another drunk person, you are accountable for your behavior. The person initiating the sexual act is responsible for getting consent."   *See generally*, http://stopsexualviolence.iu.edu/policies-terms/consent.html  (accessed  6/30/16).   State Defendants' failure to apply this policy in a gender-neutral fashion evidences State Defendants' bias against male students such as John Doe and preference for female students such as Jane Doe.

79. A few days later on October 26, 2015, Sgt. Schmuhl interviewed GJ who—like Jane Doe--provided inconsistent testimony in an attempt to allege Jane Doe was incapacitated. For instance, GJ told Sgt. Schmuhl that Jane Doe was "completely drunk… and needing someone to take care of her." *Exhibit 1,* pg. 44.  This statement is markedly inconsistent with her earlier statement to Ofr. Collins about wanting to leave John Doe and Jane Doe alone to talk and maybe make out.  *Id.,* pg. 30.  In addition, GJ's decision to leave John Doe and Jane Doe alone to talk and maybe make out manifests GJ's comfort level in Jane Doe's decision-making capacity and John Doe's personal reputation in the dorm community.  This is contrary to earlier in the evening when GJ told Jane Doe not to go off with a male student that Jane Doe wanted to "suck . . . ."  *Id.,* pg. 73  GJ trusted Jane Doe's and John Doe's capacity to make their own decisions and allowed Jane Doe to achieve her goal of hooking up with an IU student.

80. In a gender-neutral environment, State Defendants would have cited the aforementioned inconsistencies in GJ's testimony as evidence of John Doe's innocence.  This is particularly true because GJ provided other inconsistent testimony such as alleging she knocked on John Doe's door twice.  *Id.,* pg. 100.  This testimony contradicted that of Jane Doe and John Doe who both report only a single time of anyone knocking on John Doe's door, after which John Doe answered the door.  *Id.,* pp. 30, 33, 41.

81. In addition, State Defendants also ignored: (a) GJ's admission that she and Jane Doe consumed approximately the same amount of alcohol in the same time frame as GJ – yet GJ never alleged she was incapacitated; (b) BM testified that on the night in question that GJ: "…didn't seem drunk; she seemed fine." *Id.,* pg. 102; and (c) GJ's statement that Jane

Doe admitted she felt like she had "done something dumb" by hooking up with John Doe. *Id.*, pg. 44

82. Sergeant Schmuhl also interviewed RD who stated that she and Jane Doe were at the same party until about 11:45 p.m., but that she did not know how much alcohol Jane Doe consumed. *Id.*, pg. 43

83. Finally, Sergeant Schmuhl interviewed CK, even though CK did not see Jane Doe and was not even present on the IU campus the night of the alleged assault. CK stated that Jane Doe called him earlier in the night and texted him. He reported that texts he received from Jane Doe one and a half hours before the alleged assault show misspellings. Upon information and belief, State Defendants relied in part on this testimony of CK to determine that Jane Doe was unable to consent to sex due to her level of alcohol consumption even though: (a) Jane Doe's text messages frequently include misspellings; *Id.*, pg. 54, 59, 60, 61 and (b) John Doe never exchanged any texts with Jane Doe and had no knowledge of Jane Doe's text messaging and spelling habits either before or after their sexual encounter. (c) Jane Doe sent a text at 3:06 a.m. (closest in time to her interaction with John Doe) which was free of significant misspellings. *Id.* Upon information and belief, Individual Defendants did so because IU trained Individual Defendants to equate "victim/complainants" in sexual misconduct proceedings as being females who must receive preferential treatment in part because of pressure from the federal government.

### IU'S INVESTIGATION
### AND DISCIPLINE OF JOHN DOE

84. After deciding criminal charges were unwarranted, IU assigned Defendant Monroe as the Investigator to determine whether John Doe had violated IU Policies.

85. On October 18, 2015 around 8:00 pm, a chain of emails was forwarded from IUPD to numerous members of the IU academic community notifying them of Jane Doe's report, including but not limited to Defendants Goldsmith, Faranesh, Casares, and Monroe *Id.,* pp. 26, 27. The emails, with the subject line "sexual assault" repeatedly identify Jane Doe by name as a "victim." John Doe is also identified by name. This email introduces and establishes State Defendants' bias at the very outset of the investigation in part by referring to Jane Doe as the "victim."

86. On October 19, 2015, Monroe received an email from Holly Davis, Assistant Resident Manager of John Doe's dormitory, copied to multiple other IU employees of unknown role and without respect to John Doe's anonymity, with the subject line [dormitory name] Title 9 incident. *Id.,* pg. 65

87. On November 4, 2015, Monroe sent John Doe a letter advising him that the Office of Student Ethics was conducting an investigation about the events of October 18, 2015. (*Exhibit 18* containing 11/4/15 letter from Monroe to John Doe).  Monroe's letter to John Doe indicates Monroe presumed he was guilty of sexual assault even before starting her investigation.  This is because Monroe's letter said "[s]pecifically, on or around October 18, 2015, at [your dormitory] you sexually assaulted a campus visitor, [Jane Doe], without her consent and while she was in an impaired state." *Id.* Upon information and belief, Monroe presumed John Doe was guilty in part because of State Defendants' gender bias towards males accused of sexual assault, as detailed above.

88. On or about November 4, 2015, Monroe also issued a "No Contact Order" to John Doe prohibiting him from contacting Jane Doe in any manner and informing him that he had to appear for an investigation meeting with Monroe on November 12, 2015. *Id.*

89. On or about November 12, 2015, John Doe met with Monroe for approximately 45 minutes. During the meeting, John Doe denied the allegations against him and provided a written statement *Exhibit 1*, pg. 80.  This written statement detailed John Doe's consensual sexual encounter with Jane Doe when she was not incapacitated.   Moreover, John Doe's statements to Monroe were completely consistent with his: (a) statements to the IUPD, which Monroe possessed when she interviewed John Doe; and (b) subsequent testimony at his IU disciplinary hearing.

90. During his November 12, 2015 meeting with Monroe, John Doe asked if he was permitted to provide credibility witnesses.  Monroe told John Doe she would not interview credibility witnesses because she could only interview witnesses who interacted with Jane Doe or John Doe on the night of the alleged assault. *Id.,* pg. 81, 103  However, Monroe interviewed no witnesses with whom John Doe interacted on the night in question, instead interviewing only Jane Doe's female friends and credibility witnesses.

91. Monroe's refusal to interview John Doe's credibility witnesses manifests her intent to provide preferential treatment to female complainants in part because she had knowledge of unsubstantiated claims by GJ regarding John Doe's character that she included in the investigation file.  For instance, Monroe noted how GJ "heard from another woman on the floor that John Doe was creepy" *Id.,* pg. 65 and likewise, GJ's comment to IUPD that "some of her friends said he is "kinda creepy." *Id.,* pg. 44. Yet, State Defendants' denied John Doe the opportunity to refute this unsubstantiated and anonymous hearsay allegation in part because they prohibited him from presenting credibility witnesses.

92. Monroe's refusal to interview John Doe's credibility witnesses manifest her intent to provide preferential treatment to female complainants in part because on November 4,

2012, Monroe interviewed Jane Doe's witness – a friend with the initials AM. Monroe interviewed AM even though: (1) AM was not in Indiana when Jane Doe alleges John Doe assaulted her; and (2) AM told Monroe she "really doesn't know a whole lot." *Id.,* pg. 108. Upon information and belief, Monroe and/or IU conducted the interview of AM, to obtain information to achieve the intended gender biased result of finding John Doe responsible for violating IU Policies. Nevertheless, AM confirmed Jane Doe did call AM sometime around 3 a.m. after being with John Doe, and that at first Jane Doe seemed "really hyper and in a good mood" before saying "self-deprecating" things about herself, at which point GJ took the phone away from Jane Doe. *Id.* However, upon information and belief, State Defendants ignored this evidence supporting John Doe's innocence because it conflicted with their belief that females alleging sexual misconduct are entitled to preferential treatment when it comes to weighing evidence.

93. Similarly, upon information and belief, Monroe's gender bias precluded her from conducting a fair and impartial investigation. Evidence supporting this belief includes the fact that Monroe never met with John Doe after the initial meeting on November 12, 2015 even though she suggested she would do so and that John Doe indicated he wanted to share his first person account with her at another time. *Id.,* pg. 103  Yet, Monroe's communications with Jane Doe evidence an intent to help her avoid making inconsistent statements which John Doe might use in his defense. For example, Monroe advised Jane Doe, on October 22, 2015, that she did not have to make any statement or provide any information to Monroe. Instead, Monroe told Jane Doe that Monroe could rely on the police report. *Id.,* pg. 95.

94. In the end, Jane Doe opted to talk to Monroe.  In doing so, Jane Doe provided additional inconsistent testimony.  For example, Jane Doe told: (a) Ofr. Collins that "she didn't want to continue having sex" when she knew GJ had returned; (b) Sgt. Schmuhl that Jane Doe "realized what was going to happen" (i.e. sex); and (c) she admitted even asking John Doe to turn off the lights (i.e. modify the environment to her liking).  *Id.,* pg. 41.  However, Jane Doe told Monroe that she: "didn't know what was going on or what to do."  *Id.,* pg.

95. On one hand, Jane Doe tells Ofr. Collins that her telling John Doe to answer the door was her way of letting him know she did not want to continue having intercourse.  *Id.,* pg. 30.  Yet, Jane Doe told Monroe that when "her friend came back and was pounding on the door" she told John Doe "he needed to stop "the sexual intercourse. *Id.,* pg. 95.  Similarly, GJ told Ofr. Collins that Jane Doe was not so intoxicated she could not walk and talk.  *Id.,* pg. 29.  However, Jane Doe told Monroe "her friends had decided she was too intoxicated (at the second party) and needed to leave." *Id.,* pg. 95. Additionally, Jane Doe directly contrdiced her own testimony in another instance where she tells Sgt. Schmuhl that after her friend left the room, she asked John Doe to tell her more about himself, but he did not reciprocate. However, she tells Defendant Monroe that John Doe did reciprocate. *Ex. 1.* These inconsistencies and contradictions within her own testimony demonstrate a lack of commitment on Jane Doe's part to describe events truthfully.

95. Monroe also interviewed BM on November 30, 2015. BM told Monroe that she did not know Jane Doe at all before that evening, but she stated that Jane Doe was drunk.  BM also told Monroe that GJ and Jane Doe stepped out into the hallway at or about midnight. *Id.,* pg. 102.  This statement contradicted Jane Doe, GJ and John Doe's testimony about John Doe and Jane Doe's physical interaction occurring closer to 3 a.m.

42

96. Upon information and belief, a female hearing panel member asked BM the following leading question to elicit evidence to find John Doe responsible: "[w]hat gave you indication *she was really drunk*?"   But, in response, BM answered: "I didn't really see [Jane Doe] in the beginning . . . [later] she did seem sluggish I guess but I don't really know her that well."   Despite the hearing panel's attempts to get BM to provide testimony alleging Jane Doe was incapacitated, BM did not state Jane Doe was incapacitated or that she exhibited any specific signs that might suggest that Jane Doe was too impaired by alcohol to consent to sex.

97. Monroe ignored other testimony from BM that manifest John Doe's innocence.   For instance, BM told Monroe that immediately upon leaving John Doe's room Jane Doe reported she had sex, but said nothing about being sexually assaulted. *Id.,* pg. 102.

98. Monroe also failed to identify inconsistent portions of BM's testimony.   For example, BM did not enter John Doe's room, but states John Doe: "was naked and standing behind the door."   This allegation defies physics unless BM is able to see through a solid door into a dark room and make such observations.  *Id.*   Similarly, BM alleged GJ took Jane Doe from John Doe's room back to GJ's room.  *Id.*   This allegation lacks merit because both Jane Doe and GJ stated Jane Doe went to the bathroom on her own after leaving John Doe's room. *Id.,* pg. 30, 41, 44. BM's testimony also contradicts GJ's statement that BM went back to GJ's room on her own, while GJ waited outside the bathroom for Jane Doe.  *Id.,* pg. 37

99. On December 1, 2015, Monroe interviewed GJ who confirmed that she and Jane Doe attended two parties and that Jane Doe drank only at the first party. *Id.,* pg. 100.  In addition, GJ provided additional inconsistent testimony.  For example, GJ stated that after inviting

themselves to John Doe's room, she told Jane Doe, "let's leave," but that Jane Doe asked to stay for a few more minutes. *Id*. In contrast, GJ had told IUPD that she left because she wanted to leave them alone "to talk and maybe make out . . . ." *Id*. pg. 30. GJ also told Monroe she knocked on John Doe's door twice. *Id.*, pg. 100 This allegation contradicts both Jane Doe and John Doe who both report only one knock after which John Doe answered the door. *Id.*, pp. 30, 33, 41Lastly, GJ told Monroe that after John Doe opened the door to his room, she went into the room and "pulled up Jane Doe's pants for her and they left." *Id.*, pg. 100. This contradicts GJ's statement to IUPD Sgt. Schmuhl to whom she stated that after entering the room, she "told her (Jane Doe) to put her pants on." *Id.*, pg. 44. It also contradicts the testimony of Jane Doe who told IUPD Ofc. Collins and Sgt. Schmuhl that she put her pants on herself before leaving John Doe's room. *Id.*, pp. 30, 41 100.

The aforementioned information provided to Monroe contradicted and cast doubt on Jane Doe, BM, and GJ's testimony. Nonetheless, upon information and belief, Monroe failed to investigate, consider, or notify the hearing panel of the inconsistent statements. Similarly, upon information and belief, State Defendants inhibited John Doe's ability to address Monroe's gender biased investigation, in part, because IU did not require Monroe to attend the hearing so that John Doe could directly question Monroe and choose not to question her themselves. Upon information and belief, the hearing panel did not require Monroe's attendance because they adopt IU's edict to "always believe the complainant, " and thus saw no need to ask her any questions that would possibly highlight the problems with Jane Doe and other witness statements, why Monroe did not interview John Doe when he expressed an interest in meeting with her (but did meet with Jane Doe), or why she denied John Doe credibility witnesses (but allowed such witnesses for Jane Doe).

101.     State Defendants' aforementioned failure to consider exculpatory evidence of John Doe's innocence in favor of Jane Doe's contradictory testimony and the fact that State Defendants formed a conclusion adverse to John Doe without an apparent reason based on the evidence available to State Defendants is further evidence of State Defendants': (a) gender bias against John Doe, and/or (b) intention to forsake obligations to adjudicate Jane Doe's allegations in a fair and unbiased fashion.

102.     On or about December 9, 2015, IU and/or State Defendants provided Jane Doe and/or her advocate, Rene Henry, an opportunity to review the IU investigation file and rebut John Doe's statement. On December 9, 2015, Jane Doe emailed Amber Monroe her rebuttal, writing, "there were a couple parts of John Doe's statement that I would like to respond to." Jane Doe's rebuttal again provided a different version of the events. *Id.,* pg. 105 Jane Doe admits she kissed John Doe but alleges she did not initiate the kissing. *Id.* She does not refute her statement to Sgt. Schmuhl that she enjoyed the kissing and the making out. *Id.,* pg. 41. She states that she did not ask if John Doe had a condom but again, does not retract her earlier statements to Ofr. Collins and Sgt. Schmuhl that she discussed using a condom with him, and that she stated to John Doe "she did not know how to do that," when John Doe asked her if she could put the condom on him. *Id.,* pg. 30, 41  Jane Doe's statement also addresses John Doe's statement to Sgt. Schmuhl and Det. Koontz that while they were having sex, Jane Doe "had her arms around his torso and the two were kissing most of the time." *Id.,* pg. 33,  In her rebuttal, Jane Doe does not deny that she was kissing John Doe most of the time while they were having sex or that her arms were on his torso. *Id.* pg. 105 Instead, Jane Doe oddly suggests that John Doe, while having intercourse with her, would have stopped to position her arms around his torso.  *Id.*

103.    On December 18, 2015, Monroe spoke with a Professor Craig who teaches business at IU about Jane Doe's assault allegations against John Doe. Craig told Monroe how a student in his class, alleged Jane Doe had been raped by John Doe. *Id.,* pg. 106. This student's statements to Professor Craig about John Doe evidence retaliation and/or breach of confidentiality under IU Policies.  Yet, upon information and belief, Monroe's bias against male students caused her to take no disciplinary action against this student.

104.    Upon information and belief, Monroe's investigation was tainted by gender bias such as her equating "complainants" in sexual misconduct proceedings as being females who must receive preferential treatment in part because of pressure from the federal government. In addition, Monroe's gender bias to provide preferential treatment to the female complainant can also be seen in her manipulation of witness selection to control information and evidence. For example, Monroe only chooses to interview three individuals, all of whom were female. Of these three females, two were long-time "hometown" friends of Jane Doe—and one of these was not even in Indiana at the time in question. Monroe ignored opportunities to interview males who interacted with Jane Doe, such as the male Jane Doe refere to in a text message that she "almost suck" but GJ "say no," the male credibility witnesses of John Doe, and the second interview John Doe requested with Monroe to review his statement, but which she denied.

105.    Because of Monroe's gender biased investigation and violations of John Doe's Constitutional and Title IX rights detailed in part above, IU unlawfully charged John Doe with sexually assaulting Jane Doe. *Id.,* pg. 83-84.  John Doe was advised of this decision via a January 5, 2016 letter from Defendant Casares. *Id.*  Casares set the matter for judicial hearing even though Monroe's investigation was still incomplete at that time. *Id.* pg. 33

106.     The Judicial Hearing was held on January 16, 2016. From the outset, the hearing

was rife with violations of OCR directives which include, but are not limited to:

a) "Public and state-supported schools must provide due process to the alleged
   perpetrator" *U.S. Dep*'t Of Education Office of Civil Rights, *Dear Colleague
   Letter,*      (Apr.      4.      2011);
   http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html
   (accessed 6/22/16);

b) IU must employ "[p]rocedures that . . . will lead to sound and supportable
   decisions." *U.S. Dep*'t Of Education Office of Civil Rights, *Revised Sexual
   Harassment Guidance: Harassment of Students By School Employees, Other
   Students,     or     Third     Parties*     (Jan.     2001);
   http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf;          (accessed
   6/22/16); and

*c)* "Investigations must be adequate, reliable and impartial, including the
   opportunity for both parties to present witnesses and other evidence." *Id.*

107.     For example, upon information and belief, and as detailed above, the hearing

officers assigned to John Doe's Judicial Hearing - Defendants Casares, Maul, and Farenesh

– were: (a) biased against male students; and (b) equated "complainants" in sexual

misconduct proceedings as being females who should receive preferential treatment in part

because of pressure from the federal government.

108.     Evidence of Casares' gender bias includes, but is not limited to his statement that

he "always believes the complainant." http://jasoncasares.blogspot.com/2016/04/faith-

and-belief-in-system-my-story-my.htm (accessed 6/22/16).  In other words, Casares admits

his bias and admits that he starts each case believing that the respondent is guilty.[7] Upon

---

[7] Casares' blog post explains his experiences surrounding the allegation of sexual assault levied against him
in December 2015. In his post, he writes that false reports do happen, though rarely, but still you should
always believe the complainant. Further he writes, "you should believe, but it doesn't mean you don't
investigate and it does not mean you make a decision without the facts…However, I discovered that the
media, general public, and professionals doing this work—do develop opinions and make decisions with
only one side of the story, despite the facts...Certainly, we have so much work to do in the area of neutrality
and eliminating bias."." *Exhibit 8.*  In maintaining one should "always believe the complainant," Casares'

information and belief, Casares, as IU's Deputy Title IX director, had a supervisory and/or training role for defendants Faranesh, Monroe, and Maul, and his subordinates likely shared his views. In addition, upon information and belief, Casares, as the head of IU's Title IX efforts was under pressure internally and from the DOE to discipline aggressively male students alleged to have engaged in sexual misconduct.

109.    In addition, IU violated John Doe's Constitutional and/or Title IX rights by allowing Casares to adjudicate the charges against John Doe despite his having a "conflict of interest" detailed in the 2011 Dear Colleague Letter.  *See generally, 2011 Dear Colleague Letter*, p.7 (stating: "Title IX coordinators *should not* have other job responsibilities that may create a conflict of interest.  For example, serving as the Title IX coordinator and a disciplinary hearing board member . . . may create a conflict of interest.").

110.    Similarly, during John Doe's hearing, Casares violated John Doe's Constitutional and/or Title IX rights by, among other things: (a) stating questions from John Doe to Jane Doe had to go through the chair; while Jane Doe's questions did not need to go through the chair; and (b) denying John Doe, and the panel, the right to cross-examine Jane Doe by allowing Jane Doe to participate but telling John Doe and the Hearing Panel that she would not answer any questions. Furthermore, the absence of Jane Doe put Casares and the panel in the position of assuming a prosecutorial bias and impermissibly shifted the burden of proof from Jane Doe to John Doe to prove he did not sexually assault Jane Doe.

111.    In fact, Casares' declaration that Jane Doe would "not be verbally participating" in the hearing and would not answer questions must only have come about during prior, undisclosed conversation, undocumented or withheld from the IU investigation file, as

_____

unlawfully shifts the burden of proof to male respondents like John Doe.

Casares did not ask Jane Doe at any time during the hearing whether she would be "verbally participating," rather, he presented this fact with foreknowledge, as something that had been previously discussed and decided. Upon information and belief, Casares counseled Jane Doe not to verbally participate or answer questions with the intent to help her avoid making inconsistent statements which John Doe might use in his defense and to protect her from having to address the multiple inconsistencies already evident in her statements to IUPD and Defendant Monroe.

112.    Evidence of Casares' gender bias and willingness to communicate with Jane Doe in this manner, manifest a pattern and practice of inappropriate behavior as evidenced in a prior lawsuit in which he was named as a Defendant.  (*Exhibit 19, 20* (containing Complaint and Memorandum Contra Motion to Dismiss from *Hemington vs Arizona*).  In this lawsuit, the plaintiff alleged a pattern of behavior favoring female complainants.  For example, this lawsuit alleges: "Casares, on many occasions, stepped out of his role as a neutral adjudicator and counseled the alleged victim...In fact, during some of the longer meetings with the alleged victim, Casares could not indicate, from his notes, any substantive inquiry with the alleged victim into the facts and circumstances surrounding the events of October 23, 2008." *Exhibit 20,* pg. 6-8.  Similarly, this lawsuit alleges: "Far from disagreeing with the alleged victim and requiring the production of these records, Casares was complicit in her failure to produce the items. He did not report her failures in his report, but he actually suggested, on one occasion, that he could view certain items of evidence and just return them to her so he would not be required to disclose them to Hemington." *Id.,* pg. 8.

113.    Moreover, upon information and belief, IU failed to adequately train and educate Casares, Faranesh, Maul, Goldsmith and other "individuals involved in implementing

IU's sexual misconduct procedures…on issues and applicable policies and procedures relating to sexual misconduct, as well as how to conduct the investigation and hearing process in a manner that protects the safety of all parties and promotes fairness and accountability" in violation of its own CSRRC and federal requirements. (*Exhibit 5,* pp.3, 4)  For example upon information and belief, a female hearing panel member, required to be impartial,  asked John Doe the following leading question to elicit evidence to find him responsible: "…there is a statement that this should be kept between the two of you. Why would you say that?" The panelist ignored John Doe's clear testimony to IUPD at the outset of the investigation that GJ made this statement to him. *Exhibit 1,* pg. 48.  The panel member, taking a prosecutorial stance, and favoring Jane Doe and her witnesses, accepted GJ's allegation that John Doe said this. During the hearing, she did not ask GJ the same question, i.e. "Why would you (GJ) say that?"  In so doing, the panelist (a) confirmed her gender-biased approach to the interpretation of evidence, and (b) repeated an unfair, biased pattern of questioning that demonstrates the panelists placed themselves in the position of prosecuting Jane Doe's case against John Doe. To her biased questioning, John Doe responded, at the hearing, in a manner consistent with his original testimony to IUPD, "I disagree 100% with this…GJ said those exact words to me."

114.     Further evidence supporting Casares' bias to provide preferential treatment to female complainants and inability to conduct an investigation and hearing process in a fair, unbiased manner includes his previously reported interactions with another female complainant at IU made public in the IU campus newspaper. Regarding his questioning of a male respondent accused of sexual assault during a hearing panel that he chaired, Casares was quoted as telling the complainant that he, during the hearing, "was going to try to

generate a reaction from the accused that would "break him." In addition, when delivering the finding of the hearing panel to the complainant, Casares said, "I really did try to break him..."

*See*, http://www.idsnews.com/section/sexual-assault2  (accessed 6/30/16).

115.　　Upon information and belief, Faranesh and Maul also relied heavily on the gender-biased opinions of Casares, who was motivated to find John Doe responsible due to his own gender bias and pressures to discipline aggressively male students accused of sexual assault, because of his position as the Title IX Coordinator at IU.

116.　　Defendants Casares, Maul, and Farenesh manifest gender bias in part because they ignored credibility defects in Jane Doe's testimony and that of her witnesses when John Doe raised these issues. This manifests gender bias in part because when Casares himself became the subject of sexual assault allegations he noted: "credibility" is established through the lack of "inconsistencies" because in sexual misconduct investigations "credibility defines our work." (*Exhibit 8*)   The inconsistencies highlighted in this Complaint in the statements of Jane Doe and her witnesses are (a) multiple, (b) easily identified, and (c) significantly diminish the credibility of Jane Doe's allegations and the believability of her witness' statements, unless they are ignored as to favor a gender-biased finding.

117.　　Further evidence that IU failed to adequately train and educate Casares, Faranesh, and Maul, and/or that they were intent on ignoring his consistent statements to achieve a preordained gender-biased finding is evidenced by: (1) the fact that Defendant Monroe did not testify at the hearing and could not be questioned about her investigation and conclusion; and (2)  in their questioning of the witness GJ. When asked how much Jane

Doe drank, GJ responds "4-5 good sized shots" and later states shots of vodka.  In response, a panel member asks, "What is a 'good-sized shot'"?  To which, GJ responds at first in an unclear manner before concluding, "….cups, like completely full."  Then, later to a question from Casares, "What do you mean, 'cup'", GJ states "shots out of a solo cup."

118.    None of the hearing panel members questioned any of the following three inconsistencies in GJ's testimony in the preceding paragraph.  First, if a person consumed four or five 12 to 16 oz. Solo cups full of vodka, that person would likely, at a minimum, become unconscious.  Second, if Jane Doe consumed four or five 12 to 16 oz. Solo cups full of vodka, then she and GJ would have both been unconscious because GJ repeatedly testified she and Jane Doe consumed the same amount of alcohol.  Third, GJ repeatedly claimed alcohol had little or no impact on her because she told the hearing panel she "was able to take care of Jane Doe throughout the night."   Clearly, this would not have been possible if Jane Doe and GJ consumed four or five 12 to 16 oz., Solo cups full of vodka.

119.    As detailed above, State Defendants ignored John Doe's consistent statements regarding his innocence in order to achieve a preordained gender-biased finding adverse to John Doe.  Evidence supporting this belief includes Casares, Maul, and Farenesh's failure to ask any of the hearing witnesses whether, at the time Jane Doe met with John Doe, approximately three hours after having had any alcohol, she was exhibiting any of the specific signs that she was too impaired to consent to sex as outlined in http://stopsexualviolence.iu.edu/policies-terms/sexual-misconduct-policy.html  (accessed 6/30/16).  *See, Infra* ¶ 139

120.    Further evidence that State Defendants ignored testimony that demonstrated John Doe's innocence in order to achieve a preordained gender-biased finding is present in that

John Doe explicitly, in his statements to the hearing panel, (*Exhibit 21* and *22* containing John Doe's Statements to Hearing Panel) made them aware of Jane Doe's testimony that she consented to sexual intercourse. Jane Doe states very clearly in her interviews with IUPD and Monroe that it was only when GJ knocked at the door that she no longer wanted to continue having intercourse with John Doe.  At that point, she clearly stated to Ofr. Collins, Sgt. Schmuhl and Monroe that her way of asking John Doe to discontinue intercourse was by asking him to open the door, which John Doe immediately did. (*Exhibit 1,* pp. 30, 42, 95) John Doe put the panel on notice that Jane Doe had admitted to consensual intercourse up to the point that GJ started knocking on the door.

121.     Casares, Maul, and Farenesh ultimately violated John Doe's Constitutional and Title IX rights by unlawfully finding John Doe responsible for sexually assaulting Jane Doe.  *Exhibit 1*, pp. 85, 86.

122.     Upon information and belief, State Defendants engaged in the aforementioned behavior and ignored John Doe's consistent statements regarding his innocence to achieve a preordained gender-biased finding adverse to John Doe.  Evidence supporting this belief includes, but is not limited to, ATIXA's Tip of the Week – (*Exhibit 23*) - which explains how five colleges "got it completely wrong" in finding male students responsible for "hook-ups" when alcohol was involved.  ATIXA expressed concerns that these colleges are making "Title IX Plaintiffs" of the students who were wrongly accused.   And, ATIXA noted:

> "A common policy problem comes from failing to distinguish between intoxicated and incapacitated. Yet, the most serious issue comes from failing to implement a mens rea, if you will, within the definition. Certainly, criminal concepts like mens rea are not strictly applicable to the campus conduct process, but if we agree as I stated above that having sex with a willing, yet intoxicated person is not

an offense, there must be something that the respondent does, beyond having sex, that makes a lawful act (sex) into a policy violation . . . ***there has to be something more than an intent to have sex to make this an offense. Otherwise, men are simply being punished for having sex, which is gender discrimination under Title IX, because their partners are having sex too and are not being subject to the code of conduct for doing so. Without a knowledge standard, a respondent will suffer an arbitrary and capricious application of the college's rules***." *Id.* (emphasis added).

123.     Evidence proving Casares, Maul, and Farenesh reached this type of gender-biased decision includes, but is not limited to the fact that Jane Doe never demonstrated she was too intoxicated to consent. This admission undermines State Defendants' finding that alcohol caused Jane Doe to be unable to consent because it is a clear expression of her complete understanding of what was happening at all times during the sexual encounter.[8]

124.     Evidence that State Defendants violated John Doe's Constitutional and Title IX rights includes, but is not limited to, the record being devoid of evidence that Jane Doe did not knowingly and voluntarily consent to sexual activity.  For, Jane Doe stated, after the fact, that asking John Doe to answer the door was her way of indicating she *did not want to continue* having intercourse and wanted to withdraw her previous consent whereby she initiated and participated in sexual intercourse.  *Id.,* pg. 30  And, there is no dispute that

---

[8] This Court is familiar with these issues, having previously issued a preliminary injunction requiring a University to reinstate a student without restriction who had been suspended for sexual assault. *King v. DePauw Univ.*, No. 2:14-CV-70-WTL-DKL, 2014 U.S. Dist. LEXIS 117075, *27-29 (S.D. Ind. Aug. 22, 2014). This Court challenged the University hearing board's core finding that "it should have been apparent" to the accused that his accuser was "extremely intoxicated, to the point that she could not give consent" to sexual activity.  *Id.,* *32.  For, this Court noted: "[q]uite frankly, the Court sees very little evidence that supports this conclusion."  *Id.* information." In summarizing the implications of *King v DePauw* in a way that is indeed prescient for the case at hand, one author writes, "This is precisely the kind of concern raised by accused students who assert that colleges are not evenhanded in investigating sexual misconduct allegations." (see also http://chronicle.com/article/In-Sexual-Misconduct-Cases/148783/ and https://www.thefire.org/due-process-advocates-take-critical-look-colleges-dealing-sexual-assault-allegations/ accessed 6/30/16)

Jane Doe's request that John Doe answer the door was mutually understandable only as a request to answer the door, not to stop having sex.  Moreover, Jane Doe's request, even if it is interpreted as an alleged mutually understandable request to stop, was immediately complied with. This fact is evidenced in Jane Doe's text, which states when she suggested John Doe "stop, he stopped." *Id.,* pg. 60

125.     Further evidence that State Defendants violated John Doe's Constitutional and Title IX rights includes, but is not limited to, the evidence indicating Jane Doe initiated and/or consented to all sexual activity with John Doe when she was not incapacitated by alcohol.

126.     Additional evidence that State Defendants violated John Doe's Constitutional and Title IX rights includes, but is not limited to, State Defendants erroneously and unlawfully shifting the burden to John Doe, essentially assuming his guilt and requiring him to prove by a preponderance of the evidence that he did not sexually assault Jane Doe.

127.     Further evidence that State Defendants violated John Doe's Constitutional and Title IX rights includes, but is not limited to, the failure of IU to provide any written explanation to John Doe detailing how or why the hearing panel reached its decision. Rather, John Doe was notified of the finding in a brief meeting with Casares, where he was only told that the panel decided that Jane Doe was too incapacitated to consent to sex, with no explanation as to how the panel came to that decision based on the evidence presented. *See, Exhibit 1,* pp. 85, 86

128.     On January 30, 2016, John Doe timely appealed the decision of the Hearing Panel *Exhibit 24,* containing John Doe's appeal to IU. In his appeal, John Doe presented information to demonstrate why the appeal should be granted, including, but not limited

to, examples to demonstrate that the preponderance of the evidence demonstrated that John Doe was not responsible. (*Id.*)

129.    Defendant Goldsmith was responsible for deciding John Doe's appeal. The appeal put Defendant Goldsmith on notice of the unlawful actions of Casares, Maul, and Farenesh and violations of IU Policies.  In addition, Defendant Goldsmith had the power to remedy the Hearing Panel's unlawful actions and correct the policy violations.

130.    Even though IU's Policies required John Doe's Appeal be granted, Defendant Goldsmith rejected John Doe's appeal on February 8, 2016, as follows: "after reviewing your request, it has been determined that the basis for an appeal has not been met and the appeal will not move forward."  *Exhibit 1,* pp. 92, 93 containing letter 2/8/16 Goldsmith to John Doe).  In doing so, Goldsmith violated John Doe's Constitutional and Title IX rights by failing to provide a sufficient evidentiary basis for rejecting John Doe's appeal.

131.    Upon information and belief, Goldsmith rejected John Doe's appeal because of his: (a) gender bias against male students and/or pressure from OCR to aggressively discipline male students alleged to have engaged in sexual misconduct; and/or (b) equating "complainants" in sexual misconduct proceedings as being females who must receive preferential treatment in part because of pressure from the federal government; (c) avoiding additional public criticism and/or criticism from student groups for not acting aggressively to discipline male students accused of sexual misconduct while IU was contemporaneously embroiled in a potential media scandal regarding the sexual assault allegations against Defendant Casares; and/or (d) failure of IU to train Goldsmith appropriately so that he could recognize (i) the myriad violations and inconsistencies in the investigation and

hearing and (ii) the failure of hearing panel to establish  the preponderance of evidence standard before finding John Doe responsible.

### STATE DEFENDANTS' VIOLATIONS OF IU POLICIES AND/OR CONSTITUTIONAL AND/OR TITLE IX RIGHTS

132.     Throughout John Doe's disciplinary investigation State Defendants violated IU Policies and/or John Doe's Constitutional and/or Title IX rights.   Upon information and belief, State Defendants' decision to engage in this practice was motivated – in part - by the anti-male gender bias detailed in this Complaint. Upon information and belief, IU adopted policies and practices that are gender-biased—in part—to avoid negative publicity.

133.     State Defendants' conduct detailed above violated John Doe's Constitutional and/or Title IX rights and/or the CSRRC, which guarantees that all "parties will have equal opportunities to present information" and that "[t]he University will have as a priority, the interests of all parties involved…." *Id.,* pg. 87. Upon information and belief, State Defendants' decision to engage in this conduct was motivated – in part - by the anti-male gender bias detailed in this Complaint.

134.     State Defendants' conduct detailed above violated John Doe's Constitutional and/or Title IX rights and/or violated IU's Sexual Misconduct Policy (UA-03), which provides that: "the University will provide a fair and impartial investigation and resolution for complaints." (*Exhibit 5,* pg.2. See also, http://stopsexualviolence.iu.edu/policies-terms/index.html (accessed 6/22/16). Upon information and belief, State Defendants' decision to engage in this conduct was motivated – in part - by the anti-male gender bias detailed in this Complaint.

135.     Moreover, despite these guarantees of equity and fairness, the CSRRC and the Sexual Misconduct Policy contain several policies and/or procedures that denied John Doe and other similarly situated male students their Constitutional and Title IX rights. For instance, the CSRRC requires the respondent to attend the sexual misconduct hearing, but allows the complainant to choose whether to attend. *Exhibit 1,* pg. 88. If the complainant chooses not to appear – or like Jane Doe appears (in this case by telephone) but refuses to answer questions - respondents such as John Doe are denied all opportunities to cross examine their accusers. *Id.* Upon information and belief, State Defendants' decision to engage in these practices was motivated – in part - by the anti-male gender bias detailed in this Complaint.

136.     Defendants' conduct detailed above violated John Doe's Constitutional and/or Title IX rights and/or violated IU's definition of sexual assault below found in the CSRRC:

> Personal H20d1- Physical abuse of any person, including the following: … When an individual subjects another person to sexual penetration (as defined in the Sexual Misconduct Policy, UA-03) (i) without the consent of the person, (ii) *when the individual knew or should have known that the other person was mentally or physically incapable of resisting or appreciating the nature of the other person's own conduct* . . . ."
>
> http://studentcode.iu.edu/responsibilities/on-campus-personal.html
>
> (accessed 7/5/16  emphasis added).

137.     Evidence of this violation includes, but is not limited to, the fact that the preponderance of the evidence proved IU possessed no evidence suggesting John Doe, who

had just met Jane Doe, knew or should have known that she was mentally or physically

incapable of resisting (or) that Jane Doe was incapable of appreciating the nature of John

Doe's conduct.  Upon information and belief, State Defendants' decision to violate this

policy was motivated – in part - by the anti-male gender bias detailed in this Complaint.

138.    State Defendants' conduct detailed above violated John Doe's Constitutional

and/or Title IX rights and/or violated the Stop Sexual Violence program IU joined in March

2015.    (http://stopsexualviolence.iu.edu/policies-terms/sexual-misconduct-policy.html

accessed 6/22/16). This program falls within IU Policies in part because IU's Sexual

Misconduct Policy incorporates "important information on the policies and procedures

used by the University in preventing and responding to incidents of sexual misconduct."

Regarding alcohol, The Stop Sexual Violence website states: "[b]elow are some obvious

signs that a person is impaired by alcohol and/or drugs and can no longer make a clear

decision (giving consent):

- If a person is stumbling or falling down;

- If a person cannot stand or walk on their own;

- If a person's speech is slurred or they are not communicating clearly;

- If a person cannot focus their eyes or is confused about what is
  happening around them;

- If a person has urinated, defecated, or vomited on themselves or
  around them;

- If a person is sleeping or unconscious, he or she cannot give consent.

http://stopsexualviolence.iu.edu/policies-terms/consent.html  (accessed  6/22/16).

Here, the unrefuted preponderance of the evidence proved Jane Doe was not when she

59

met John Doe: (a) stumbling or falling down, (b) unable to stand or walk on her own; (c) unable to communicate clearly; (d) confused about what was happening around her; (e) urinating, defecating, or vomiting on herself or others; or (f) sleeping or unconscious.   Upon information and belief, State Defendants' violation of this policy was motivated, in part, by the anti-male gender bias detailed in this Complaint and, in part, by inadequate training provided by IU and/or an inability to conduct a fair, balanced investigation in accordance with IU's own stated policies.

139.     State Defendants' conduct detailed above violated John Doe's Constitutional and/or Title IX rights and/or the Sexual Misconduct Policy which states:

> Indiana University recognizes that sexual misconduct may result in grave and often long-lasting effects on those involved and is committed to timely investigation of allegations of sexual misconduct, use of interim measures when appropriate, and appropriate actions and consequences following investigations. Indiana University is committed to compliance with state and federal laws regarding sexual misconduct, required reporting to state and federal agencies, and to working with law enforcement officials and agencies.

140.     Upon information and belief, State Defendants' decision to violate this policy was motivated, in part, by anti-male gender bias as detailed in this Complaint and in part was the result of inadequate training and/or refusal to conduct a fair, balanced, and unbiased investigation.

## PARTIES, JURISDICTION, VENUE

141.      John Doe currently resides in the state of North Carolina.

142.      Defendant IU is an instrumentality of the State of Indiana with its principal place of business located in Indiana.

143.      At all times relevant to this Complaint, Defendant Jane Doe was a student at Butler University in Indianapolis, Indiana. Upon information and belief, Defendant Jane Doe is a resident of the State of Tennessee.

144.      During time periods relevant to this Complaint, Defendant Casares acted within the scope of his employment at IU, which included, but was not limited to, serving as IU's Associate Dean of Student and Deputy Title IX Director.

145.      During time periods relevant to this Complaint, Defendant Monroe acted within the scope of her employment at IU, which included, but was not limited to, serving as IU's Title IX Deputy Investigator.

146.      During time periods relevant to this Complaint, Defendant Faranesh acted within the scope of his employment at IU, which included, but was not limited to, serving as IU's Associate Director, Office of Student Ethics.

147.      During the times relevant to this Complaint, Defendant Maul acted within the scope of her employment at IU, which included, but was not limited to, serving as IU's Residence Manager.

148.      During time periods relevant to this Complaint, Defendant Goldsmith acted within the scope of his employment at IU, which included, but was not limited to, serving as IU's Dean of Students.

149.     Upon information and belief, State Defendants are acting under regulations set forth in the Indiana Code, as well as the policies, procedures, and practices of IU and are responsible for administering and/or operating IU's Polices.

150.     This action arises under Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.*, the Fifth and Fourteenth Amendments to the Indiana and United States Constitution, 42 U.S.C. §1983, and Indiana common law.

151.     This Court has jurisdiction over this action by virtue of federal question jurisdiction pursuant to 28 U.S.C. §1331 and the protection of civil rights pursuant to 28 U.S.C. §1343.

152.     This Court has personal jurisdiction over Defendants because Defendants reside and/or conduct business within the State of Indiana.

153.     Venue rests with this Court pursuant to 28 U.S.C. §1391 and Southern District Civil Rule 82.1 because a substantial part of the events or omissions giving rise to the claims occurred in its judicial district.

**Count 1**
**Defamation Per Se**
(against Defendant Jane Doe only)

154.     John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

155.     Jane Doe orally and in writing defamed John Doe by falsely telling third parties not associated with law enforcement or John Doe's IU disciplinary proceeding that John Doe sexually assaulted Jane Doe ("Jane Doe's Defamatory Allegations").

156.     Jane Doe's Defamatory Allegations include, but are not limited to written and verbal statements to third parties outside of the disciplinary proceedings that John Doe

raped her without using a condom. For example, sometime between October 18, 2015 and November 18, 2015, Jane Doe had the following text exchange with AM:

AM: What happened?

Doe: I got raped two weekend ago. Don't tell anyone please

AM: [Jane], What . . . Where? How? Who? And don't worry, it stays with me

Doe: Yeah, I'm dealing with a shit ton of legal stuff it's a blast. At IU it's a long story but I'll tell you in person and this dick named [John Doe]

\***

AM: What an ass. Hope he rots. Disgusting.

Doe: Yeah it's pretty fucking shitty

\***

AM: Wow . . . did he use a condom?

Doe: no

*Exhibit 1,* pp. 59, 60.

157. Jane Doe's Defamatory Allegations were made with the intent to be understood by those that received the allegations that John Doe committed an offense involving moral turpitude that subjected John Doe to potential infamous punishment and therefore imputes the defamatory character of the oral and written statements.

158. Jane Doe's Defamatory Allegations were false and defamatory and were made with actual malice motivated by ill will, intent to deceive, improper motive, and/or an affirmative act to injure John Doe and/or reckless disregard for the truth or falsity of the oral and/or written statements.

159. In the alternative, Jane Doe negligently made the aforementioned false and defamatory statements about John Doe.

160.     Jane Doe's Defamatory Allegations were made with the intent to harm John Doe's standing with IU, his future educational and employment opportunities, and his standing and reputation at IU and in the public at large.

161.     As a direct result of Jane Doe's Defamatory Allegations, the character and reputation of John Doe at IU and in the community at large was impaired and he suffered and will continue to suffer mental anguish, personal humiliation, and a great loss of reputation.

162.     Jane Doe's conduct detailed above caused John Doe to seek medical help to address profound and ongoing psychological and mental anguish.

163.     As a further direct and proximate cause of Jane Doe's Defamatory Allegations, John Doe was unlawfully disciplined by IU, which has or will result in, among other consequences and damages, loss of employment opportunities and/or wages, loss of educational opportunities, difficulty in gaining entrance to another university comparable to IU, reduced future earning capacity, and attorneys' fees.

**Count 2**
**Intentional Infliction of Emotional Distress**
(against Defendant Jane Doe only)

164.     John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

165.     When Jane Doe engaged in Jane Doe's Defamatory Allegations, she knew or should have known her actions would cause John Doe to suffer serious emotional injury, mental anguish, and/or a great loss of reputation.

166. Jane Doe's Defamatory Allegations exhibited an intentional, reckless, and/or deliberate disregard of the high degree of probability that John Doe would suffer immediate and continuing emotional distress.

167. Jane Doe's Defamatory Allegations caused John Doe to suffer profound and ongoing psychological and mental anguish.

166. Jane Doe's Defamatory Allegations were malicious, willful and/or intentional.

167. As a direct and proximate result of Jane Doe's aforesaid conduct, John Doe has suffered and will continue to suffer, severe and extreme emotional distress.

WHEREFORE, for Counts 1 and 2, John Doe demands judgment against Jane Doe as follows:

a. Damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to compensate John Doe's past and future pecuniary and/or non-pecuniary damages caused by Jane Doe's conduct;

b. Judgment for attorneys' fees, pursuant any applicable statute;

c. Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

d. Pre-judgment interest and/or post judgment interest as may be permitted by law and statute; and/or

e. Such other and further relief as this court may deem just, proper, equitable, and appropriate.

### Count 3:
### Violation of Title IX –Hostile environment sexual harassment and/or discrimination
(against IU only)

168. John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

169.     Pursuant to 20 U.S.C. § 1681, Title IX is a federal statute designed to prevent sexual discrimination and/or harassment in educational institutions receiving federal funding.

170.     Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, applies to all public and private educational institutions that receive federal funds, including colleges and universities. The statute prohibits discrimination based on sex in a school's "education program or activity," which includes all of the school's operations. Title IX provides in pertinent part: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The United States Supreme Court has held that Title IX authorizes private suits for damages in certain circumstances.

171.     IU receives federal financial assistance and is thus subject to Title IX.

172.     Title IX includes an implied private right of action, without any requirement that administrative remedies, if any, be exhausted. An aggrieved plaintiff may seek money damages and other relief.

173.     Both the DOE and the DOJ have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or its regulations. 34 C.F.R. § 106.8(b) (Department of Education); 28 C.F.R. § 54.135(b) (Department of Justice).

174.     Title IX mandates IU afford equitable procedures and due process to John Doe which includes, but is not limited to:  (a) having proper jurisdictional authority to conduct an investigation;  (b) providing adequate, reliable, and impartial investigation of

66

complaints, including the opportunity to present witnesses and other evidence, and/or (c) that IU employees involved in the conduct of the procedures have adequate training.

175.     IU knew, or in the exercise of due care should have known, that IU lacked jurisdiction under IU Policies to investigate and/or discipline John Doe for a physical encounter Jane Doe initiated with John Doe.

176.     Upon information and belief, IU knew, or in the exercise of due care should have known, employees including, but not limited to, Individual Defendants received gender biased training regarding Title IX which caused them to violate John Doe's Constitutional and Title IX rights in part by equating "complainants" in sexual misconduct proceedings as being females who must receive preferential treatment.

177.     IU's policies fail to meet the standards required by Title IX and/or Constitutional safeguards as interpreted by United States' courts regarding how institutions of higher education conduct disciplinary proceedings.

178.     Upon information and belief, in virtually all cases of campus sexual misconduct by IU students, the accused student is male and the accusing student is female.

179.     As detailed throughout this Complaint, IU created an environment in which male students accused of sexual assault, such as John Doe, are fundamentally denied due process as to be virtually assured of a finding of guilt. Such a biased and one-sided process deprives male IU students like John Doe of educational opportunities based on their gender.

180.     Upon information and belief, IU's investigation and/or discipline of John Doe was taken in order to demonstrate to DOE, DOJ, OCR, President Obama's Administration, and/or the general public that IU: (a) is aggressively disciplining male students accused of

sexual assault; and (b) providing females involved in sexual misconduct proceedings with preferential treatment not provided to males.

181.     State Defendants had actual or constructive knowledge that IU's investigation and/or discipline of John Doe posed a persuasive and unreasonable risk of gender discrimination with regard to John Doe.

182.     State Defendants' actions and inactions detailed above and below set in motion a series of events that IU knew, or reasonably should have known, would cause male IU students, such as John Doe, to suffer unlawful gender discrimination.

183.     State Defendants' investigation and/or discipline of John Doe is discriminatory and based upon or motivated by John Doe's male gender.

184.     The male gender discrimination by State Defendants against John Doe includes, but is not limited to, providing preferential treatment to Jane Doe.  This preferential treatment includes, but is not limited to allowing Jane Doe, but not John Doe, the opportunity to review and respond to witness statements, present credibility witnesses, and attend and make a statement at the disciplinary hearing without having to respond to any questions.

185.     IU employees, including but not limited to Individual Defendants, unlawfully failed to exercise the authority to institute corrective measures to remedy: (a) State Defendants' violations of John Doe's rights under IU Policies, Title IX, guidance promulgated by OCR, and/or the Constitutions of the United States and/or Indiana; and/or (b) State Defendants' unlawful determination that John Doe violated IU Policies which IU adopted pursuant to federal laws and regulations related to Title IX.

186.     IU employees, including but not limited to Individual Defendants, exhibited deliberate indifference by refusing to remedy: (a) IU's violations of John Doe's rights under IU Policies, Title IX, guidance promulgated by OCR, and/or the Constitutions of the United States and/or Indiana; and/or (b) State Defendants' erroneous determination that John Doe violated IU Policies which IU adopted pursuant to federal laws and regulations related to Title IX.

187.     IU's deliberate indifference caused John Doe to suffer sexual harassment and/or discrimination so severe, pervasive or objectively offensive that it deprived John Doe of access to educational opportunities or benefits (and) caused other harms detailed above.

188.     Upon information and belief, State Defendants possess additional documentation evidencing their unlawful pattern of gender-biased decision making which favors female students over male students like John Doe who are falsely accused of sexual assault. Evidence supporting this allegation includes, but is not limited to, IU's failure to respond fully to a public records request detailed above.

189.     Upon information and belief, State Defendants possess additional documentation evidencing their refusal to discipline female students who were alleged to have sexually assaulted male students.  Evidence supporting this allegation includes, but is not limited to, IU's failure to respond fully to a public records request detailed above.

190.     IU's hostile environment sexual harassment and/or discrimination caused John Doe to be damaged in an amount to be determined at trial.

**Count 4:**
**Violation of Title IX – Deliberate Indifference**
(against IU only)

191.     John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

192.     IU employees, including but not limited to Individual Defendants, acted with deliberate indifference towards John Doe because of his male gender.

193.     IU employees, including but not limited to Individual Defendants, unlawfully failed to exercise the authority to institute corrective measures to remedy: (a) State Defendants' violations of John Doe's rights under IU Policies, Title IX, guidance promulgated by OCR, and/or the Constitutions of the United States and/or Indiana; and/or (b) State Defendants' erroneous determination that John Doe violated IU's policies which IU adopted pursuant to federal laws and regulations related to Title IX.

194.     IU employees, including but not limited to Individual Defendants, exhibited deliberate indifference by refusing to remedy: (a) State Defendants' violations of John Doe's rights under IU Policies, Title IX, guidance promulgated by OCR, and/or the Constitutions of the United States and/or Indiana; and/or (b) IU's erroneous determination that John Doe violated IU Policies which IU adopted pursuant to federal laws and regulations related to Title IX.

195.     Upon information and belief, State Defendants possess additional documentation evidencing their gender based deliberate indifference towards John Doe and/or other similarly situated male students.  Evidence supporting this allegation includes, but is not limited to, IU's failure to fully respond to a public records request detailed above.

196.     IU's deliberate indifference caused John Doe to be damaged in an amount to be determined at trial.

**<u>Count 5</u>**

### Violation of Title IX – Erroneous Outcome
(against IU only)

197.    John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

198.    IU employees, including but not limited to Individual Defendants, unlawfully disciplined John Doe because of his male gender.

199.    By erroneously disciplining John Doe, IU violated IU Policies, Title IX, guidance promulgated by OCR, and/or the Constitutions of the United States and/or Indiana.

200.    IU employees, including but not limited to Individual Defendants, unlawfully failed to exercise the authority to institute corrective measures to remedy: (a) State Defendants' violations of John Doe's rights under IU Policies, Title IX, guidance promulgated by OCR, and/or the Constitutions of the United States and/or Indiana; and/or (b) IU's erroneous determination that John Doe violated IU Policies which IU adopted pursuant to federal laws and regulations related to Title IX.

201.    IU employees, including but not limited to Individual Defendants, exhibited deliberate indifference by refusing to remedy: (a) State Defendants' violations of John Doe's rights under IU Policies, Title IX, guidance promulgated by OCR, and/or the Constitutions of the United States and/or Indiana; and/or (b) IU's erroneous determination that John Doe violated IU Policies which IU adopted pursuant to federal laws and regulations related to Title IX.

202.    IU's conduct detailed above involved arbitrary and capricious violations of John Doe's Constitutional rights.

203.    Upon information and belief, IU possesses additional communications evidencing IU's deliberate indifference in imposing unlawful discipline on John Doe based on his

gender.  Evidence supporting this allegation includes, but is not limited to, IU's failure to respond to a public records request detailed above.

204.    IU's wrongful discipline of John Doe caused John Doe to be damaged in an amount to be determined at trial.

WHEREFORE, regarding Counts 3-5, John Doe demands judgment and relief against IU as follows:

a.  Damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to compensate John Doe's past and future pecuniary and/or non-pecuniary damages caused by Defendants' conduct;

b.  Order(s) requiring IU expunge John Doe's official IU files of all information related to his interactions with Jane Doe;

c.  Order(s) requiring John Doe's reinstatement to IU;

d.  Judgment for attorneys' fees, pursuant any applicable statute;

e.  Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

f.  Pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or

g.  Such other and further relief as this court may deem just, proper, equitable, and appropriate.[9]

---

[9] For example, John Doe is entitled to injunctive relief in part because IU and/or Individual Defendants' discipline of John Doe is unlawful and violates John Doe' rights under IU's Policies, federal and/or state laws.  In addition, as detailed in this Complaint, IU and/or Individual Defendants' unlawful discipline of John Doe will cause irreparable harm that is certain, great, actual and not theoretical.  Moreover, IU and/or Individual Defendants' discipline cannot be remedied by an award of monetary damages because of difficulty or uncertainty in proof or calculation.  The granting of injunctive relief will cause no harm to IU and/or Individual Defendants because these defendants have no cognizable interest in the unlawful discipline of John Doe.  The granting of an injunctive relief will also advance a significant and appreciable

**Count 6**
**Violation of the Procedural and Substantive Component of the Due Process Clause**
**of the Fourteenth Amendment to the United States Constitution Pursuant to 42 U.S.C.**
**§1983**
(Against Individual Defendants in their official capacities for injunctive relief (and) in their
personal capacity for money damages)

205.     John Doe realleges and incorporates all the allegations contained in preceding

paragraphs of this Complaint as though fully rewritten herein.

206.     The Fourteenth Amendment to the United States Constitution provides that no state

shall "deprive any person of life, liberty, or property, without due process of law."

207.     Fourteenth Amendment due process protections are required in higher education

disciplinary proceedings.

208.     Individual Defendants are considered state actors who owe John Doe certain

protections pursuant to the Fourteenth Amendments to the United States Constitution and

other Constitution provisions.

209.     Individual Defendants' conduct detailed in this Complaint violated John Doe's Due

Process rights in part by allowing anti-male bias to motivate their decision to deny John

Doe the "fundamentally fair [disciplinary] procedures" required by United States Supreme

Court decisions such as Goss *v. Lopez*, 419 U.S. 565 (1975).

210.     Even without the anti-male bias detailed in the Complaint, Individual Defendants'

conduct detailed above violated John Doe's Due Process rights in part by denying John

---

public interest by protecting members of the public – like John Doe –from having their fundamental rights
threatened by unlawful government action. Therefore, John Doe is entitled to injunctive relief which
includes, but is not limited to an Order requiring IU and/or Individual Defendants:(a) expunge John Doe's
official IU student file of all information related his encounter with Jane Doe; and (b) be barred from
disclosing IU's aforementioned discipline of John Doe to third parties in the future.

Doe the "fundamentally fair [disciplinary] procedures" required by United States Supreme Court decisions such as Goss *v. Lopez*, 419 U.S. 565 (1975).

211.    Individual Defendants' conduct detailed in this Complaint violated John Doe's Due Process rights in part by irreparably damaging John Doe's right to pursue an education and future educational and employment opportunities and occupational liberty. *See e.g., Dixon v. Alabama State Board of Education*, 294 F.2d 150, cert. denied, 368 U.S. 930, 82 S. Ct. 368, 7 L.Ed.2d 193 (1961)(stating, "[i]t requires no argument to demonstrate that education is vital and, indeed, basic to civilized society . . . [i]t is most unlikely that a public college would accept a student expelled from another public college of the same state. Indeed, expulsion may well prejudice the student in completing his education at any other institution. Surely no one can question that the right to remain at the college in which the plaintiffs were students in good standing is an interest of extremely great value.").

212.    Individual Defendants' conduct violated John Doe's protected property interest in his education (and) right to pursue an education and future educational and employment opportunities and occupational liberty.

213.    Individual Defendants violated John Doe's Due Process rights in part because John Doe was denied a review by a gender-neutral and impartial decision maker.

214.    Individual Defendants violated John Doe's Due Process rights in part because John Doe was denied a "meaningful" opportunity to clear his name.  *See e.g., Matthews v. Eldridge,* 492 U.S. 319, 333 (1976)(requiring disciplinary procedures that take place "at a meaningful time and in a meaningful manner.").

215.     Individual Defendants violated John Doe's Due Process rights in part because Individual Defendants' prohibited John Doe from accessing information necessary for his defense and/or internal appeal.

216.     Individual Defendants violated John Doe's Due Process rights in part because Individual Defendants' conduct evidenced arbitrary and/or irrational behavior that was not justified by any governmental interest.

217.     Individual Defendants violated John Doe's Due Process rights in part because Individual Defendants' conduct was motivated by malice, ill will, bad faith, and/or an intent to injure John Doe.

218.     Individual Defendants violated John Doe's Due Process rights in part because they engaged in the arbitrary abuse of executive power so egregious that it shocks the conscience of the public.  Evidence of this fact is contained in publications cited herein criticizing academics for violating the Constitutional rights of male college students in the same – or similar way – that Individual Defendants violated John Doe's Due Process.

219.     Individual Defendants violated John Doe's Due Process rights in part because John Doe would not have been disciplined had Individual Defendants acted in a gender-neutral manner.

220.     Individual Defendants violated John Doe's Due Process rights in part because Individual Defendants' engaged in a gender-biased pattern and/or practice of disregarding and violating the rights of male students such as John Doe when these males were accused of sexually assaulting a female student.

221.     Individual Defendants acted, or failed to act, under color of law, to deprive John Doe's rights and privileges secured by the Fourteenth Amendment to the United States Constitution and other Constitution provisions.

222.     Individual Defendants' conduct evidenced an intentional, outrageous, and/or reckless disregard for John Doe's constitutional rights.

223.     Individual Defendants' conduct towards John Doe lacked any rational basis and/or was motivated by ill will or bad faith.

224.     As a result of Individual Defendants' Due Process violations, John Doe was suspended and suffers ongoing harm, including but not limited damage to his future educational and employment opportunities (and) and his standing and reputation which is marred in part by Individual Defendants' unlawful finding that John Doe engaged in sexual misconduct.

225.     Individual Defendants' investigation and/or discipline of John Doe deprive John Doe of his interests within the meaning of "life, liberty, or property" contained in U.S. Const. amend. XIV, § 1 in part because Defendants violate John Doe's property right to a transcript unmarred by Defendants' unlawful investigation and/or discipline of John Doe.

226.     Upon information and believe, Individual Defendants agreed to, approved, and/or ratified the various violations of John Doe's Due Process rights detailed in this Complaint.

227.     Individual Defendants had actual or constructive knowledge that they were engaging in conduct creating a pervasive and unreasonable risk of deprivation of John Doe's rights under the Fourteenth Amendments to the United States Constitution.

228.     Because of Individual Defendants' unlawful actions, John Doe is entitled to injunctive relief that requires Individual Defendants: (a) expunge John Doe's official IU

student file of all information related his sexual encounter with Jane Doe; and (b) reinstate John Doe as a IU student.

229.     Because of Individual Defendants' unlawful actions, John Doe is entitled to declaratory relief that requires Individual Defendants: (a) expunge John Doe's official IU student file of all information related his encounter with Jane Doe; (b) be barred from disclosing IU's aforementioned discipline of John Doe to third parties in the future; and (c) reinstate John Doe as a IU student.

## Count 7-
## Violation of Equal Protection Clause
## of the Fourteenth Amendment to the United States Constitution
## Pursuant to 42 U.S.C. §1983
(Against Individual Defendants in their official capacities for injunctive relief (and) in their personal capacity for money damages)

230.     John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

231.     The Fourteenth Amendment to the United States Constitution prohibits gender discrimination.

232.     As evidenced by the facts and exhibits detailed above, gender discrimination improperly caused Individual Defendants unlawfully to find John Doe responsible for engaging in sexual misconduct with Jane Doe.

233.     Upon information and belief, female IU students suffer no historical disadvantage regarding the discernment of consent to intimate physical relationships with male students that would allow Individual Defendants validly to discriminate against male students like John Doe.

234.     John Doe brings these claims pursuant to 42 U.S.C. § 1983 because Individual Defendants' actions were taken by Individual Defendants under color of state law.

235.     Because of these violations, John Doe has suffered considerable emotional distress, loss of present and future earnings, humiliation, and damage to his reputation because of Individual Defendants' actions.

WHEREFORE, regarding Counts 6-7, John Doe demands judgment and relief as follows:

h.  Individual Defendants be found liable in their official capacity to John Doe for injunctive relieve requiring they: (a) expunge John Doe's official IU student file of all information related his encounter with Jane Doe; (b) be barred from disclosing IU's aforementioned discipline of John Doe to third parties in the future; and (c) reinstate John Doe as a IU student.

i.  Individual Defendants be found liable in their personal capacity for money damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to compensate John Doe's past and future pecuniary and/or non-pecuniary damages caused by Defendants' conduct;

j.  Judgment for attorneys' fees, pursuant any applicable statute;

k.  Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

l.  Pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or

m.  Such other and further relief as this court may deem just, proper, equitable, and appropriate.

**Count 8 – Declaratory Judgment -**
**Violation of Due Process Provisions of United States and Indiana Constitutions**

(Against IU and/or Individual Defendants)

236.     John Doe realleges and incorporates all the allegations contained in the preceding paragraphs of the Complaint as though fully rewritten herein.

237.     The Fifth Amendment to the United States Constitution, made applicable to the State of Indiana by the Fourteenth Amendment, provides that no person shall be deprived of life, liberty, or property, without due process of law."

238.     The Fourteenth Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law."

239.     Section 12, Article I, Indiana Constitution, guarantees that every person injured in his person, property or reputation shall have remedy by "due course of law."

240.     The Due Process Clauses of the Indiana and United States Constitutions are implicated by higher education disciplinary decisions, including the disciplinary decisions under the IU Code of Student Conduct.

241.     IU and/or Individual Defendants have a constitutional obligation to provide a fundamentally fair and reliable hearing process.

242.     IU and/or Individual Defendants have an additional obligation to provide a hearing process that is consistent with the customs of a free society, which includes recognition of the basic due process rights of students.

243.     IU and/or Individual Defendants violated John Doe's rights under the Constitutions of Indiana and the United States to the opportunity to be heard in a meaningful manner during the hearing and appeal addressed above.

244.     John Doe's interests in the results of the hearing and appeal addressed above are significant in part because:

f. Suspension and the notation of suspension from IU on John Doe's transcript denies John Doe the benefits of his education at IU;

g. Suspension and the notation of suspension from IU on John Doe's transcript damages John Doe's academic and professional reputation; and/or

h. Suspension and the notation of suspension from IU on John Doe's transcript has and will continue to affect John Doe's ability to enroll at other institutions of higher education and to pursue his chosen career.

245. IU and/or Individual Defendants' violations of John Doe's Title IX and/or Constitutional Rights include, but are not limited to, the following:

i. Engaging in gender biased investigations which irreparably tainted John Doe's aforementioned hearing and appeal;

j. Prohibiting John Doe from effectively cross-examining witnesses who testified against him;

k. Applying IU Policies and the gender neutral terms contained in these policies in a gender biased fashion;

l. Even without the anti-male bias, conducting an investigation and hearing process in a manner that denied John Doe fundamentally fair procedures;

m. Presuming John Doe guilty and/or imposing on John Doe the burden of proof regarding his innocence; and

n. Upon information and belief, engaging in a pattern and practice of unlawfully disciplining innocence male students like John Doe in order to appease OCR or other sources of pressure expressing a desire for increased discipline of male students who are alleged to have engaged in sexual misconduct.

246.    John Doe and/or Individual Defendants have a dispute about whether the IU Policies as applied to John Doe violate the Due Process Clauses of the United States Constitution, the Due Course of Law Clause of the Indiana Constitution, and the requirement that any hearing process be consistent with the customs of a free society.

247.    John Doe is entitled to a declaration that the IU Policies, as applied to John Doe, violate the Due Process Clause of the United States Constitution and the Due Course of Law Clause of the Indiana Constitution.

248.    John Doe is entitled to a declaration that IU Policies, as applied to John Doe, violate the Due Process Clauses of the United States Constitution and the Due Course of Law Clause of the Indiana Constitution.

249.    John Doe is entitled to reinstatement at IU.

250.    Pursuant to 42 U.S.C. §1988, John Doe is entitled to his attorney's fees incurred in bringing this action.

## Count 9 – Breach of Contract
(Against IU only)

251.    John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein

252.    John Doe applied to and enrolled at IU and, with the assistance of his parents, paid tuition and other fees and expenses. John Doe did so in reliance on the understanding, and with the reasonable expectations, among others, that: (a) IU would implement and enforce IU Policies; and that (b) IU Policies would comply with the requirements of applicable law.

253.     IU Policies create an express contract or, alternatively, a contract implied in law or in fact, between IU and John Doe. IU violated these contracts by engaging in the conduct detailed in this Complaint.

254.     IU improperly and unlawfully applied IU's Policies in part by not affording John Doe rights to which he was entitled.

255.     IU also violated IU's Policies in part by applying an incorrect definition of consent.

256.     IU's unlawful conduct detailed in this Complaint evidences its repeated and material breaches of IU Policies as well as a breach of the implied covenant of good faith and fair dealing inherent in IU's Policies.

257.     During all times relevant to this Complaint, John Doe did all, or substantially all, of the significant things that IU Policies required John Doe do.

258.     IU's aforementioned breaches of IU's Policies were wrongful and without lawful justification or excuse. As a direct and foreseeable result of these breaches of contract, John Doe has sustained, and will continue to sustain, substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future educational and career prospects.

WHEREFORE, regarding Count 9, John Doe demands judgment and relief against IU as follows:

A.     Damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to compensate John Doe's past and future pecuniary and/or non-pecuniary damages caused by Defendants' conduct;

B.     Order(s) requiring IU to reinstate John Doe as a student and expunge John Doe's official and unofficial IU files of all information related to his interactions with Jane

Doe, including but not limited to charges and sanctions served, and prohibiting IU from disclosing such information to any third party;

C.     Judgment for attorneys' fees, pursuant to any applicable statute;

D.     Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

E.     Pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or

F.     Such other and further relief as this court may deem just, proper, equitable, and appropriate.

Respectfully Submitted,

/s/ Guy H. Haskell
Guy H. Haskell (Atty No. 26836-53)
Haskell Law
231 West Dodds Street
Bloomington, IN 47403
812-320-3954
812-618-2998 (facsimile)
ghaskell@haskell-law.org

Eric J. Rosenberg (0069958) (pending pro hac vice admission)
Tracy L. Turner (0069927) (pending pro hac vice admission)
Rosenberg & Ball Co. LPA
395 North Pearl Street
Granville, Ohio 43023
740.644.1027 phone
866.498.0811 fax
erosenberg@rosenbergball.com
tturner@rosenbergball.com

Attorneys for Plaintiff

## **<u>JURY DEMAND</u>**

John Doe hereby demands a trial by a jury in this matter.

/s/ Guy H. Haskell                
Guy H. Haskell (Atty No. 26836-53)
